[S. F. No. 14218. In Bank.—July 31, 1931.]

LOS ANGELES COUNTY FLOOD CONTROL DISTRICT (a Body Politic and Corporate), Petitioner, v. HENRY W. WRIGHT, as Chairman, etc., Respondent.

Hill, Morgan & Bledsoe, Vincent Morgan and Kenneth K. Wright for Petitioner.

E'verett W. Mattoon, County Counsel, Ray C. McAllaster, Deputy County Counsel, and Roy W. Dowds, Flood Control Counsel, for Respondent.

SHENK, J.—This is a proceeding in *mandamus* to compel the chairman of the board of supervisors of Los Angeles County to execute certain bonds alleged to be authorized by the electors of the Los Angeles County Flood Control District. The matter is submitted on a general demurrer to the petition and on a stipulation of facts made by agreement a part of the petition. The facts are therefore undisputed.

The Los Angeles County Flood Control District was created by an act of the legislature in 1915 (Stats. 1915, p. 1502), and comprises, territorially, all of Los Angeles County except those portions thereof generally known as the Antelope Valley and the islands of Santa Catalina and San Clemente. The objects and purposes of the act, as set forth in section 2 thereof, are to provide, by the creation of the district, for the control of the flood and storm waters

of the district, and to conserve such waters for beneficial and useful purposes by spreading, storing, retaining or causing to percolate into the soil within said district, or to save or conserve in any manner, all or any of such waters, and to protect from damage from such flood or storm waters the harbors, waterways, public highways, and property in said district. The district is declared to be a body corporate and politic with perpetual succession and, among other things, empowered to acquire land and property of every kind, and to construct, maintain and operate any and all works and improvements within or without the district necessary or proper to carry out the objects and purposes of the act. The board of supervisors of Los Angeles County is constituted, *ex officio,* the board of supervisors of the district. Section 4 provides that the board shall have power to employ a competent engineer or engineers to investigate the best plan to control and conserve such waters for beneficial and useful purposes and to adopt any plan so formulated. Upon the adoption of such plan the board is authorized by ordinance to call a special election in the district for the issuance of bonds to construct the works and carry on the improvements. If a majority of the electors of the district vote in favor of the bonds the board is authorized to issue forty-year bonds to cover the cost of the work, etc., salable at par, with interest not to exceed six per cent per annum, and annually to levy and collect a tax on all of the taxable real property in the district to pay interest and principal on said bonds. The tax so to be levied was declared by this court to be a special assessment for benefits. (*Los Angeles County Flood Control Dist.* v. *Hamilton,* 177 Cal. 119 [169 Pac. 1028].)

On March 26, 1924, the board directed J. W. Reagan, who was the then chief engineer of the district, to make the investigation required by the statute and to submit a report which should show (a) a general description of the work to be done; (b) general plans, profiles, cross-sections and general specifications of the work to be done; (c) a general description of the land and property to be acquired; (d) a map showing the location of the proposed work and improvement, and other information deemed to be necessary or useful, and (e) an estimate of the cost of the work.

On April 1, 1924, the engineer submitted a report which was found by the board to comply with the requirements of the act and the order of the board. This plan was approved and the estimate of the costs for which bonds were to be voted was fixed at $35,300,000. According to the report of the engineer the work to be done was divided into four parts: First, the construction of both large and small dams in the mountainous area; second, the protection of the banks of the smaller streams, together with spreading and storing of waters of these streams for beneficial use; third, the straightening and rectification, through river training and bank protection, of the major streams; and fourth, protection to the harbor and shipping interests. Both flood control and conservation were to be combined by holding back the water in the mountains and releasing it in controllable quantities, and thus remove the flood menace to great property values and augment the water supply in the district. The plan contemplated the construction of dams in San Antonio canyon, a dam at the mouth of Thompson's Creek, north of Claremont, a dam in Big Dalton canyon, a dam and reservoir at the "Forks Site" in San Gabriel canyon, dams and reservoirs in Sawpit canyon, Big Santa Anita canyon, Eaton canyon, Big Tujunga canyon and Pacoima canyon, a flood control channel in Altadena, check dams in Little Santa Anita or Sierra Madre canyon, Dunsmuir canyon, Pickens canyon and Haines canyon, works for the control of storm waters in the lower San Dimas wash country, in Verdugo wash and Sycamore canyon, and works for the control of storm waters on the lower or east San Gabriel River and in the vicinity of Long Beach and at the lower end of Ballona Valley.

A special election was called by the board of supervisors and was held on May 6, 1924, for the purpose of submitting to the qualified electors of the district the proposition of incurring a bonded indebtedness in the sum of $35,300,000. The objects and purposes for which the indebtedness was proposed to be incurred were set forth in the title, preamble and section 2 of the ordinance calling the election, and were as follows: "For the control of the flood and storm waters of said Los Angeles County Flood Control District, for the conservation of such waters for beneficial and useful purposes, by spreading, storing, retaining and

causing to percolate into the soil within said district, and for the protection from damage from such flood and storm waters of the harbors, waterways, public highways and property in said district, by the correction of rivers, diversion and care of washes, and building of dikes and dams, and for the other purposes set forth in said act, all of which work is to be done in accordance with the said report of J. W. Reagan, chief engineer of said district, adopted by the board of supervisors of said district on the first day of April, 1924, and in accordance with the provisions of the Los Angeles County Flood Control Act, reference to which said report, which is on file in the office of said board of supervisors, is hereby made for particulars.''

The board caused to be printed and furnished to voters who might apply for the same so much of the report of the chief engineer as covered a general description of the work to be done and also a map showing the location of the improvements to be made. The election was held and the proposed bond issue received a favorable vote. Thereafter bonds were issued and sold to the extent of several millions of dollars and the acquisition of property and construction work went forward. A dam in Pacoima canyon was built, the estimated cost of which was $1,720,000. Construction work in connection with the control of the Tujunga River, involving the expenditure of some $1,600,000, is well under its way to completion. Numerous other improvements at different locations in the district have been undertaken and completed under this authorization of bonds. The major item of the proposed improvement was the construction of a dam at the Forks site in the San Gabriel canyon. As originally proposed this dam was to be constructed to a height of 425 feet, providing thereby a reservoir capacity of 240,000 acre-feet of water and estimated in round numbers to cost $25,000,000. The purpose of the improvement was to control the flood waters of the 200 square mile San Gabriel watershed so as to relieve the lands in the San Gabriel Valley, and below as far as Long Beach and the ocean, from their devastating effect; to protect the harbors of Long Beach and Los Angeles, and also to conserve such waters for irrigation and other uses. Preliminary to such work the board sought and obtained reports from numerous engineers of wide reputation, includ-

ing George W. Goethals, Andrew C. Lawson, D. C. Henny, J. D. Galloway, John A. Bell and H. Hawgood, with reference to control and conservation of flood waters, geological formations and dam construction. Upon being advised to the effect that a safe dam of the size and design of the proposed dam could be constructed at the Forks site, the board proceeded with definite steps to enter upon construction work. It applied to the federal government, through its Department of Interior, for a permit to construct a railroad from the main line railroad at Azusa, below the mouth of the San Gabriel canyon, to the Forks site, a distance of about eleven miles. Opposition to the granting of this permit was filed by the city of Pasadena on the ground that the construction of the proposed railroad would interfere with the proposed construction of a dam by that city at a point about seven miles below the Forks site, and upon the further ground that another site existed for the construction of a dam by the district at a place commonly known as the "Granite Dyke Site". The Department of the Interior commissioned three engineers of that department to proceed to Los Angeles, investigate and conduct hearings with reference to the feasibility of constructing a dam at the Forks site or the Granite Dyke site. The commissioners made a report to the Secretary of the Interior recommending the granting of the permit. An appeal to the secretary was ineffectual. The permit was issued by the secretary on November 1, 1926, and a week later contracts were let by the district for the construction of the railroad. It was completed in June, 1927.

In December, 1926, upon the request of certain local organizations, the board, upon the recommendation of the Los Angeles Chapter of the National Engineering Society, employed F. H. Fowler of San Francisco, C. D. Marx of Stanford University, and C. H. Paul of Dayton, Ohio, engineers of wide repute, to investigate all matters connected with the feasibility and necessity of the construction of a dam at the Forks site and also the possibility of the construction of a dam at the Granite Dyke site. In March, 1927, those engineers submitted to the board a report condemning the Granite Dyke site as unsafe and recommending the Forks site for the construction of the

dam. On April 1, 1927, J. W. Reagan resigned as chief engineer and E. C. Eaton was appointed in his place, with D. C. Henny, J. B. Lippincott and J. W. Reagan as members of a consulting board. On May 9, 1927, plans and specifications for a dam 386 feet in height at the Forks site were submitted to and approved by the board of supervisors and bids for the construction of the dam were called for. On August 2, 1927, all bids were rejected and the chief engineer was instructed to prepare plans and specifications for a dam 425 feet in height as set forth in the original plan. On August 20th the consulting board recommended additional exploration of the east abutment. On November 12th that board recommended that foundation elevations of the dam be lowered ten feet on slope sides. In October, 1927, a taxpayer commenced a proceeding in the superior court to compel the board of supervisors to build the 385-foot dam and to enjoin the construction of the dam according to the original plan. Numerous cities in the San Gabriel Valley also brought suit to compel the board to construct the dam in accordance with the original plan. The causes were consolidated for trial and on July 26, 1928, the superior court rendered its decision granting a writ of mandate compelling the board of supervisors of the district to construct the dam proposed in the original report unless said work shall thereafter be prohibited by law or rendered contrary to the best interests of the district by change of conditions in relation thereto. On September 8, 1928, the board of supervisors again adopted plans and specifications for the dam as originally contemplated and advertised for bids. On December 7, 1928, a contract for the construction of the dam was executed. The contractor thereupon entered upon the execution of the work, which continued until September, 1929, at which time, and after the excavation of some 700,000 cubic feet of sand and rock, it was discovered that there was a possibility that a sufficiently solid foundation could not be had, whereupon the board ordered a temporary discontinuance of the work and appointed a board of engineers and geologists to further explore the foundations and bedrock as disclosed by the excavation work of the contractor. The actual construction of the dam itself had not yet been entered upon. During the years of 1926, 1927, 1928 and 1929, the district was also

engaged in purchasing and condemning lands and mining claims for the railroad right of way and for the dam and reservoir site.

In 1929 the legislature adopted an act entitled, "An Act providing for the supervision of dams by the department of public works through the state engineer for the purpose of safeguarding life and property, etc." (Stats. 1929, p. 1505.) This statute became effective on August 14, 1929, and before the cessation of work under said contract. Section 5 of the act provides that after the effective date of the act the construction of a new dam or the enlargement of any dam shall not be commenced, and dams (as in the present case) not more than ninety per cent completed on August 14, 1929, shall not be completed until the owner has applied for and obtained from the department written approval of plans and specifications. The application was required to set forth the area of the drainage basin, rainfall and stream flow records and flood flow records and estimates. The department might require data concerning subsoil and foundation conditions, etc. By section 2 of the act the word owner was defined to include the state and any of its agencies or districts. A violation of the statute is a misdemeanor punishable by fine or imprisonment or both, and in addition the department is authorized to commence an action in the superior court to compel observance of the terms of the act or to enjoin violations thereof.

On October 26, 1929, the petitioner herein made an application to the state engineer for his approval of the construction of the dam at the Forks site. The state engineer caused an examination of said dam to be made on his own behalf and also called upon a board of engineers for an investigation and report. The board advised the state engineer and that state official found that a dam of the size and type called for by the contract could not be safely constructed at the Forks site by reason of the existence of certain earthquake faults and insufficiently sound foundation and bedrock at that place and that the construction of the dam as proposed would be unsafe and a severe menace to life and property. The state engineer, on November 26, 1929, denied the application for his approval. On December 2, 1929, the district canceled and terminated the construction contract and instructed the chief engineer

to investigate the San Gabriel canyon for the purpose of ascertaining whether other dams and flood control and conservation works could be constructed in said canyon to carry out the same purpose and accomplish the same results as were contemplated by the construction of the dam at the Forks site. The investigation was made, and on December 22, 1930, E. C. Eaton, the chief engineer, filed with the board a report setting forth at length plans and projects for the control and conservation of the waters of the San Gabriel River watershed. These plans provide for the construction of small check dams in the upper reaches and laterals of the river and canyon, for three large dams at different places in said canyon, for the acquisition of spreading grounds at the mouth of said canyon, and for the construction of spreading works thereon, whereby the flood waters of said canyon may be placed in the underground water basin of the San Gabriel River and be conserved for beneficial uses. In said report it was estimated that the dam and works could be constructed and the lands therefor be acquired for approximately the sum of $20,000,000, which sum represents the unexpended balance of the originally authorized bonds for the San Gabriel canyon project.

Upon the filing of said report a hearing before the board was had at which testimony was produced to the effect that a change of conditions had occurred since the bond issue was authorized, in relation to the construction of the dam of the size and design and at the site originally proposed, consisting in and showing (1) that fires occurring over a large portion of the San Gabriel watershed would re-result in an increased quantity of loose material being brought down by floods and require the construction of check dams to aid in retarding the flow and discharge of said material; (2) that the excavation work done by the contractor for the construction of said dam had disclosed large cracks in the rock required as a foundation for the construction of said dam, and that during the course of said construction work a movement had taken place on the west abutment of the proposed dam, evidenced by a large slide which disclosed faulty and unstable foundations; (3) that in the opinion of the chief engineer a dam of the size and design of that originally proposed could not be safely constructed at the Forks site; (4) that since the voting of said

bonds there had been a steadily continuing decrease in the water in the basin of the San Garbiel Valley below the canyon, and that the lowering of the water plane had increased the capacity of said basin so that spreading grounds should be acquired for the purpose of constructing thereon spreading works whereby the flood waters might be discharged therein and thus be caused to percolate into the basin of the San Gabriel River and Valley; (5) that the construction of a dam of the size and design and at the site originally contemplated had been prohibited by law, in that the state engineer had denied the application of the district for the construction at the Forks site and had refused to permit the construction of a dam at said site; (6) that the construction of check dams, three large dams, and the acquisition of spreading grounds at the mouth of the canyon and the construction of spreading works thereon as now contemplated would result in the accomplishment of the same purposes as were planned by the construction of a dam at the Forks site and would result in even greater conservation of flood waters for beneficial uses; and (7) that the work and improvement now planned would all be constructed for approximately the estimated sum.

On December 22, 1930, the board of supervisors adopted a resolution, by a vote of four-fifths of its members, in which it was found and determined that the construction of the dam at the Forks site is now prohibited by law and rendered contrary to the best interests of the Flood Control District by reason of a change in conditions in relation thereto, which prohibition by law and change of conditions have occurred since the adoption of the original report and the voting of said bonds, and that the original plans should be changed to conform to the new plans, and that the unexpended balance in the bond fund be appropriated for the work and improvement in accordance with the new plan. The chief engineer was instructed to prepare plans and specifications to that end and the board by a four-fifths vote instructed its chairman to sign bonds in the sum of $5,000,000, the proceeds thereof to be used in the furtherance of said work.

The chairman of said board, respondent herein, alone voted in the negative on the motion to adopt the resolution above referred to and has declined to sign said bonds on the

ground, among others, that since the modified plan contemplates the expenditure of a large sum of money the board should be sure that the use of the funds derived from the sale of said bonds would be lawful, and that the doubts which he entertained as to the legality of such use required him to vote against said resolution and to refuse to sign said bonds. He therefore declined to sign said bonds as required by said resolution until the question of the legality of such sale be definitely settled in favor thereof.

The respondent places his refusal to sign the bonds on the premise that the Los Angeles County Flood Control District is in all of its essential elements a special assessment district, whose course in the proceeding to charge the lands in the district with a special assessment must be strictly construed against the district and in favor of owners of the property assessed; that the work now proposed was not included in the original plan and cannot therefore be made the subject of a special assessment to cover the cost thereof. In support of this contention the respondent cites the case of *Los Angeles County Flood C'. Dist.* v. *Hamilton,* 177 Cal. 193 [169 Pac. 1028]. That case held that the statute of 1915 was in essence a local improvement act and that the power of the board to raise funds to discharge the obligations of the district was referable to the field of special assessments as distinguished from that of the general taxing power. Consequently the respondent contends, under established general doctrines with reference to the levy of special assessments, that the rule of *strictissima juris* must be applied. This may be conceded. But when the rule is applied the statute under which the proceeding is taken must be scrutinized to determine whether there has been a departure from the statutory requirements, having in mind that under section 21 the act and every part thereof must be liberally construed to promote its objects and to carry out its intents and purposes.

The petitioner points to the proviso in section 15 of the act as full justification for the steps pursued. If the statute authorizes the proceedings subsequently taken by the board there is no contention advanced by the respondent that they were not properly taken. The proviso is as follows: "And provided, further, that any improvement for which bonds are voted under the provisions of this act shall

be made in conformity with the report, plans and specifications and map theretofore adopted, as above specified, unless the doing of any such work described in said report shall be prohibited by law, or be contrary to the best interests of the district by some change of conditions in relation thereto, in which event said board of supervisors may, by a vote of four-fifths of the members thereof, order necessary changes made in such proposed work or improvements, and may cause new plans and specifications to be made and adopted therefor.''

The controversy is then narrowed to the questions (1) whether the doing of the work according to the original plans has been prohibited by law, and if not (2) whether the execution of the work in accordance with the original plans has been rendered contrary to the best interests of the district by some change of conditions in relation thereto. As to the first question the statute of 1929 (Stats. 1929, p. 1505) makes it a penal offense to construct a dam without the written approval of the department of public works. For a violation of its provisions the department of public works is given the right to maintain *mandamus* and injunction proceedings to prevent any threatened violation thereof. The approval of the department was requested for the construction of the high dam at the Forks site. The application was denied without prejudice to the filing of another application for a dam at this or any other site. No reason has been advanced and none appears why this statute should not be upheld as a valid exercise by the state of its police power. (See *Union Bridge Co.* v. *United States,* 204 U. S. 386 [51 L. Ed. 523, 27 Sup. Ct. Rep. 367, see also, Rose's U. S. Notes]; *Gaylord* v. *City of Pasadena,* 175 Cal. 433 [166 Pac. 348].) By the terms of the act it is made applicable to such an agency as the Los Angeles County Flood Control District. No claim is made that the department of public works through its state engineer acted arbitrarily or capriciously in denying the application. On the contrary, the admitted facts in this matter show that such action was wisely exercised. The citation of authorities, which are abundant, is unnecessary to support the statement that the construction of the dam at the original site without such approval would be contrary to law and as such is prohibited by law within the meaning of the statute.

348

■ There is much discussion by counsel as to whether the discovery of the unstable and unsafe foundation work for the westerly abutment of the dam as originally planned was such a change of conditions as would authorize the board to exercise its discretion in ordering new plans and specifications to accomplish the same purposes and results as contemplated by the original plans. It may be assumed that there was no physical change in the geological formation from the time the investigations as to their character began and until their actual nature was discovered by the removal of many hundred thousand cubic yards of material. But to require that a change in existing geological formation by some cataclysm of nature would be necessary in order to constitute such a change in conditions as would justify a modified plan would be to place an unreasonable and too restricted construction upon the powers of the board. The discovery of the actual formation as distinguished from the formation believed to exist after exhaustive exploration and investigation would seem to be such a change of condition as would authorize the board to modify the plans so as to carry out the main purpose of the proceeding. In other words, a discovery of the actual conditions in place of the hitherto apparent but unknown conditions would seem to satisfy the requirements of this statute. We conclude, therefore, that the board was authorized to modify the plans and specifications with reference to this improvement not only because the construction in accordance with the original plan would have been unlawful, but also because the discovery of the actual conditions as distinguished from the apparent conditions constituted such a change in conditions as would justify a modification of the plans and a relocation of the means to be employed for checking and impounding the flood waters. That such a change of plans would be for the best interests of the district is not challenged. Indeed, no other course would seem to have been open to the board.

■ It is next to be considered whether such change of plans would, as respondent contends, violate any contractual rights of the land owners in the district arising by reason of the submission to the voters of the proposition to construct the improvement in accordance with the original plan. If any such contractual right would thus be

violated it would necessarily follow that further bonds would not be issued without a resubmission of the question of the issuance thereof to the electors in the district.

■ It may be assumed that by reason of the proposal on the part of the officers of the district and the approval of the electors therein as to the authorization and issuance of said bond issue a status analogous to a contractual relation came into being which is entitled to protection under the Constitution. The case of *Peery* v. *City of Los Angeles,* 187 .Cal. 753 [19 A. L. R. 1044, 203 Pac. 992], is authority to that effect. But in order to determine whether a contract has been violated it is necessary first to determine what the contract is. ■ In this case it was the proposal to authorize the issuance of the bonds which, in accordance with the statute, set forth the objects and purposes for which the expenditures were to be made and also the assent of the electors of the district to the proposal. In determining the extent and limitations of the contract, the .terms of the statute under which the proceedings were taken must be taken into consideration. The provisions of the statute were a part of the contract and must be held to have been personally known to every elector whose approval was sought and registered at the election. (*Peery* v. *City of Los Angeles, supra; Inglewood* v. *County of Los Angeles,* 207 Cal. 697 [280 Pac. 360].) ■ Section 8 of the act provides that the fund derived from the sale of said bonds "shall be applied exclusively to the purposes and objects mentioned in the ordinance calling such special bond election as aforesaid, *subject to the provisions in this act contained".* The ordinance calling the election specified the objects and purposes for which the proceeds of the contemplated bond issue were to be used and further provided that the indebtedness was proposed to be incurred "in accordance with the provisions of the Los Angeles County Flood Control Act". Section 23 of the act provides that the act may be designated and referred to as "Los Angeles County Flood Control Act", and that such designation and reference shall be deemed sufficient for all purposes. The proposition stated on the ballot did not refer to the statute, but it must be assumed that the ballots were cast by the electors with the terms of the statute in mind which authorized the board of supervisors to change the plans as occasion might

require, but in accordance with the terms of the statute. We conclude that there has been no impairment of the contractual rights of the electors of the district by reason of the proceedings taken by the board and that none will result by the issuance of said bonds.

The respondent's brief sets forth the form of the bonds prescribed by Ordinance No. 14 adopted by the board on June 5, 1924. This form recites that the bonds are issued in conformity with said ordinance adopted June 5, 1924, and "under the authority conferred upon said board by the provisions of an act of the legislature of the State of California designated and referred to as 'The Los Angeles County Flood Control Act', approved June 12, 1915, and after a special election held in said Los Angeles County Flood Control District on the sixth day of May, 1924, at which election there was submitted to the qualified electors of said district the proposition of incurring a bonded debt in the said sum of $35,300,000.00 for the objects and purposes as stated in the ordinance of the said Los Angeles County Flood Control District on the 4th day of April, 1924, and in the report of the chief engineer of said district adopted by the board of supervisors of said district on the 1st day of April, 1924, and at which said election a majority of the votes cast were in favor of said proposition". It is urged that the recital just quoted contains an erroneous statement of fact as to the objects and purposes of the bonded debt, if the funds are to be used in accordance with the changed plans, and that the writ should therefore be denied under the authority of *Municipal Improvement Co.* v. *Thompson,* 201 Cal. 629 [258 Pac. 955]. But there is in reality no misstatement of fact in the recital. It correctly recites the proposition submitted to the voters at the bond election which was "for the objects and purposes as stated in the ordinance" calling the election and "in the report of the chief engineer". This recital of the proposition so submitted to the voters would appear to be entirely in conformity with the facts as they have heretofore existed and do now exist.

Let the peremptory writ issue as prayed.

Waste, C. J., Curtis, J., Preston, J., Seawell, J., Richards, J., and Langdon, J., concurred.