[Civ. No. 4192. Fourth Dist. Apr. 6, 1951.]

COUNTY SANITATION DISTRICT NUMBER ONE et al., Petitioners, v. VINCENT L. HUMESTON, as Chairman of Board of Directors, etc., et al., Respondents.

C. Arthur Nisson, Jr., E. J. Marks and Adrian Marks for Petitioners.

O'Melveny & Myers, James L. Beebe and Ray H. Lindman for Respondents.

BARNARD, P. J.—This is an original proceeding in mandamus to compel the respondents to sign certain bonds of their respective districts.

Each of the petitioners is a county sanitation district organized and existing under the provisions of the "County Sanitation District Act," sections 4700 to 4856 of the Health and Safety Code, which will be referred to as the act. They are all situated in Orange County and were organized on June 9, 1948. They are cooperating in a common plan for sewage treatment and disposal, and intend to proceed under a "Joint Construction and Operation Agreement," as permitted by section 4742 of the act.

Prior to the formation of these districts a "Declaration of Policy regarding the proposed formation of Sanitary Districts 2, 3 and 7" was signed by the members of the Orange County Sanitation Advisory Committee, and by the members of a number of other committees, the boards of directors of several organizations, the governing boards of certain cities and sanitary districts within the county, and the board of supervisors. This declaration of policy recited the necessity for providing additional facilities without delay since the existing facilities for sewage disposal were overtaxed to the extent that the public health is threatened. It referred to the County Sanitation District Act, and proposed that Districts 2, 3 and 7 be formed "under the existing act, under a modified plan," and to this end the signers agreed "as a declaration of policy that Orange County Sanitation Districts 2, 3 and 7 shall be established on the following bases:

"1. that participation by these districts shall be limited to the construction and acquisition of certain facilities, to wit: the ocean outfall, treatment plant units, and major trunk sewers generally extending inland from the ocean.

"2. that the tax rate shall not exceed 10 cents in District # 2, 12 cents in District # 3 and 10 cents in District # 7,

per $100 of assessed valuation for 40 years, and that such structures shall be built or participated in by these districts as can be financed without exceeding these tax rates, and that no bond issue shall be proposed for a vote of the people which would require higher tax rates than aforesaid.''

Those three districts were formed under the provisions of the act, and not under any ''modified plan.'' After the seven districts were formed the board of directors of each took the steps leading up to the bond issues here in question, in accordance with the provisions of the act. The same engineer was employed for all the districts and, so far as material here, the reports, resolutions and proceedings were the same in each district and will be referred to as though only one district was involved. The engineer was, by resolution, directed to prepare and file with the district board a report setting forth the things required by section 4748 of the act, in the exact language of the statute. The engineer filed his report on December 22, 1948, setting forth the things thus required. The board of directors fixed the time and place for hearing objections to the report and to doing the work suggested, or any part thereof, and published notice of the hearing as required by the statute. After a hearing the board of directors approved and adopted the report.

After setting forth what he was authorized to do, as stated in section 4748 of the act and in the resolution, the engineer's report submitted for consideration a twofold plan for the construction of certain new sewage works and for the acquisition of certain existing sewage works which could be utilized ''in the proposed comprehensive sewage system.'' It then referred to a report by a board of consulting engineers, submitted in 1947, and to the ''Declaration of Policy'' above referred to. It then stated that in accordance with this declaration of policy ''the plan proposed herein includes participation by District No. 7 in joint construction of only those certain sewerage facilities to wit: the ocean outfall and appurtenant structures, treatment plant units, and major trunk sewers generally extending inland from the ocean to Ellis Avenue, which can be financed by a tax rate which will not exceed 10 cents per $100 of assessed valuation of real property within the District.'' Among other things, the report set forth a description of the new construction proposed to be done jointly with the other sanitation districts, and a general description of the property proposed to be acquired or damaged in carry-

ing out the entire plan. In connection with the latter, it was proposed that County Sanitation District No. 7 should purchase from the owners of "Section 1 of the Orange County Joint Outfall Sewer" certain named percentage interests in several existing structures. After describing the structures in which it was proposed to acquire such interests the report departed from its authorized scope and made the following suggestion or proposal:

"This Engineer's Report does not propose that District No. 7 issue, or propose the issuance of bonds, to finance the purchase from the owners of Section 1 of the Orange County Joint Outfall Sewer the interests in the existing structures as listed above. Rather, it is proposed that when these interests are sold to District No. 7 that the contract or sale documents will establish a schedule of payments by District No. 7, which payments will be made out of any surplus funds which are created by the limiting tax rate of 10 cents per $100 of assessed valuation on real property, but such payments shall be made only after having fulfilled the annual principal and semi-annual interest requirements on any and all outstanding bonds of the District. This method of payment for capacity rights in Section 1 existing structures by District No. 7 was established in the formulation of the 'limited participàtion' plan for Districts Nos. 2, 3 and 7 by the County Sanitation Advisory Committee."

After approving the engineer's report the board of directors adopted a resolution calling a special election for the purpose of submitting the question of a bond issue to the voters of the district, which resolution and notice was duly published. Among other things, this resolution and notice stated that it was the duty of the board, after the approval and adoption of the engineer's report, to submit to the voters of the district the proposition of incurring a bonded indebtedness to obtain funds with which to acquire the property and do the work set forth in the report; it ordered that a special election be held on February 28, 1949, to pass upon a bond issue in a certain amount and for the purposes set forth in the engineer's report, approved and adopted by the board, to which reference was made; it set forth these general objects and purposes and provided that the proposition to be submitted at said election should be:

"Proposition: Shall County Sanitation District No. 7 of Orange County, California, incur a bonded debt in the principal sum of $488,000.00 for the following purposes, to-wit:

"(a) the acquisition and construction by said District No. 7, together with other sanitation districts of said county, of (1) a sewage treatment plant to be located near the mouth of the Santa Ana River, (2) an ocean outfall from said sewage treatment plant to and into the Pacific Ocean, and (3) certain trunk sewers leading into said sewage treatment plant;

"all in accordance with the report of Vinton W. Bacon, Sanitation Engineer of said District No. 7, filed with the Board of Directors of said district on December 22, 1948, approved and adopted by said Board on January 26, 1949, and on file in the office of the Secretary of said Board, reference to which report is hereby made for further particulars, and in accordance with the provisions of the County Sanitation District Act?'';

and it then provided for the form of the ballot, and that the ballot should contain the proposition in the exact language just quoted.

The election was held on February 28, 1949; the ballots contained the proposition in that exact language; and the bonds were carried by more than the required two-thirds majority.

On February 28, 1951, the board of directors passed a resolution directing the issuance of the bonds as authorized at the election, and directing the chairman of the board of directors to sign said bonds. On the same day, February 28, 1951, a contract of purchase and sale was executed by which the seven petitioners agreed to purchase from the owners, and the owners agreed to sell, the respective interests in the existing sewage treatment and disposal facilities which were to be acquired under the plan proposed in the engineer's report. Among other things, this contract provided, with respect to the payments to be made by Districts Nos. 2, 3 and 7, the only ones which are in question here, that the agreed prices should be paid in certain installments and at certain times, and that the buyer districts agreed to levy sufficient taxes to pay their respective amounts within said periods.

The respondents have refused to sign the bonds for their districts, respectively, on the ground that under the bond proceedings taken there is a limiting tax rate of 10 cents per $100 of assessed valuation of real property within Districts 7 and 2, and a limiting tax rate of 12 cents on each $100 of assessed valuation of the real property within District No. 3; that this limited rate will not produce sufficient revenue to

make the payments to become due on the bonds, and to pay the purchase price of the existing facilities and the other expenses of the districts; that preceding the organization of these districts, and also preceding the bond election, the voters were told that the tax rate would be thus limited, "except in case of an emergency"; and that each respondent believes that this "gentleman's agreement" is binding upon him and should be kept.

The petitioners state that an effort will be made to keep the tax rate within the limits mentioned in the "Declaration of Policy" and assert their belief that this can be done, giving the reasons therefor. They state, however, that the bond buyers will not bid on these bonds unless they are assured that this limited tax rate is not applicable and controlling in connection with the payment of the bonds here in question. In support of the petition it is argued that the "Declaration of Policy" could have no binding effect on the future action of the boards of directors of these districts, that the language used in the engineer's report does not have the effect of establishing such a limited tax rate, and that the voters at the bond election had knowledge that this language in the report could not have that effect, since their attention was specifically called to the provisions of the statute which authorize no such limitation.

The respondents have demurred to the petition. They argue that the bond proposition submitted to and approved by the electors constitutes a contract which cannot be violated; that the "Declaration of Policy," with respect to the limited tax rates, is a part of that contract; that the issuance of bonds payable from taxes unlimited as to rate would violate that contract; that the contract for the acquisition of the existing facilities between the sanitation districts and the owners of those facilities is in violation of the contract with the electors; and that there would be a completely invalid change of purpose if Districts Nos. 2, 3 and 7 were to seek to use the proceeds of the sale of the bonds for the construction of new facilities without acquiring the existing facilities.

The provisions of the "Declaration of Policy" were mere recommendations which could have no legal effect unless they could be and were so made a part of the bond election proceedings as to become a part of the contract with the taxpayers. All of these districts were organized under the County Sanitation District Act and were subject to its provisions. Section 4747 provides that the district may levy taxes

"sufficient to meet" its bonds and "all other expenses incidental to the exercise" of its powers. These powers include the construction of "a sewerage system and sewage disposal or treatment plant" (§ 4741), and the acquiring of property necessary or convenient for the "operation of a sewerage system and sewage disposal or treatment plant" (§ 4740). The act contains no tax limitation for the obvious reason that any such limitation would be inconsistent with, and might well defeat, the purpose of the act, and thus endanger the health and well-being of the people in such a district. The act provides for an engineer's report and what shall be set forth therein (§ 4748). When this report is filed it must.not only be satisfactory to the board of directors but must comply with the provisions of the act (§ 4750). This report is to cover a general description of the work to be done and how it is to be done but, so far as the statute is concerned, it has nothing to do with how the proposed work shall be paid for. After the engineer's report is approved and adopted, the district board is directed to submit the question of a bond issue to the voters for the purpose of obtaining funds with which to acquire the property and do the work set forth in the report (§ 4780). It is provided that the resolution calling the election shall state the general objects and purposes for which the proposed bonds shall be used and refer to the engineer's report for particulars, and shall give certain information with respect to the amount of the bonds, the time of payment and the rate of interest (§ 4781). This resolution must be published (§ 4785). There is nothing in any of these provisions calling for or authorizing the submission to the voters of any question of tax limitation, or as to how the money to pay the bonds shall be raised.

█ The district board here complied with the provisions of the act throughout the entire proceedings. The main question here is whether the rate of taxation in three districts has been limited by a reference to a limited tax rate contained in the engineer's report, which report was adopted by the board and referred to in the proposition as submitted to the voters. In other words, whether this limited tax rate, as referred to in the report, has become a part of the contract.

The engineer's report, as provided for by the statute, was for certain specific things covering the work to be done and how it was to be done, but it had nothing to do with how the money to pay for the work was to be raised. In approv-

ing the report the board did not necessarily approve and adopt all incidental matters therein which were not within the scope of the report as authorized by the statute and as set forth in the resolution employing the engineer. That the board did not intend to adopt these portions of the report is indicated by the fact that by fixing a time and place for hearing objections to the report it impliedly found that it complied with the provisions of the act (§ 4750). In the bond election proceedings the board not only called attention to the engineer's report but repeatedly called attention to the provisions of the act. Having their attention thus called to the statutory provisions the electors were advised as to the scope of the engineer's report under the statute, and are chargeable with knowledge that they were referred to the engineer's report for what was properly included therein, the nature and description of the work proposed to be done, and with knowledge that the matter of raising money to pay the bonds was controlled by the statute and not by the engineer's report.

In view of the purpose for which these districts are organized it might well be questioned whether they could legally limit their taxing power if they directly and clearly attempted to do so. If it be assumed that this could legally be done it would require a clear, express and definite expression on the part of the board in submitting such a bond election to the voters, indicating such a purpose and intent. In the absence of any clear expression thereof, such an intent should not be presumed from the mere adoption of a long report on other matters which happened to contain an incidental statement on a matter not within the scope of the report, with which it had nothing to do, and concerning which the engineer had not been authorized either to act or to report. As was said in *Golden Gate Bridge etc. Dist.* v. *Felt*, 214 Cal. 308, at page 328 [5 P.2d 585], where the engineer's report contained a brief declaration that taxes might be levied only for certain purposes, ''It seems too plain for argument that this statement, part of a lengthy report on other subjects, cannot be deemed to be an official interpretation by the district of the legal effect of the act. In any event, it has no efficacy when in conflict with the law itself.'' In the bond election proceedings here, the voters were repeatedly referred not only to the engineer's report, but to the statute itself.

The language of this engineer's report, in reference to a tax limitation, is somewhat ambiguous and uncertain, if not

inconsistent. The report sets forth, under one heading, a general description of the new construction work proposed to be done in carrying out the purpose sought in connection with the over-all plan. Under a separate heading, it gives a general description of the existing facilities which it was proposed to acquire as a part of the project as a whole. Early in the report it is stated that in accordance with the ''Declaration of Policy'' the proposed plan included participation by District No. 7 in the ''construction'' of only certain named facilities which ''can be financed'' by a tax rate not exceeding 10 cents per $100. Much later in the report it is stated that it was proposed to acquire certain existing facilities, under some future contract with the owners, to be paid for out of any surplus funds ''created'' by the limited tax rate, and then only after any and all bond payments were taken care of; and that this method of payment for the existing facilities had been established by the ''Declaration of Policy.'' The ''Declaration of Policy'' had made no distinction between paying for new construction and for existing facilities. The report seems somewhat inconsistent in first providing for new construction up to the full amount of the limited tax rate, and later suggesting that the existing facilities should be purchased under a future contract in which the owners would agree to accept payment out of any surplus created by the limited tax rate. There might well be no such surplus, and the entire suggestion as to a limited tax rate is not only unauthorized but so uncertain and indefinite, if not inconsistent, that it could not reasonably have been relied upon by the voters, in the manner and for the purpose here claimed. The voters were repeatedly notified in the bond election proceedings, including the ballot itself, that in voting upon the proposition submitted they were referred for further particulars both to the engineer's report and to the provisions of the act. Under the circumstances, the voters should and must have understood that they were referred to the engineer's report for particulars as to the work to be done, including the acquisition of existing facilities, and to the statute for particulars as to how the money was to be raised to pay for these things.

The voters were referred directly to the statute itself, which provides that the district may levy taxes sufficient to meet all its permitted obligations and this without any limitation on the tax rate. As was said in *Los Angeles County Flood Control Dist.* v. *Wright,* 213 Cal. 335 [2 P.2d 168], ''In determining the extent and limitations of the contract, the

terms of the statute under which the proceedings were taken must be taken into consideration. The provisions of the statute were a part of the contract and must be held to have been personally known to every elector whose approval was sought and registered at the election.'' In that case the ballot did not refer to the statute. Here, the attention of the voters was directly called to the statute in the resolution calling the election, in the published notice of election, and in the ballot. Under such circumstances the provisions of the statute cannot be ignored, and the voters would be in no position to claim that they relied on an incidental and unauthorized statement in the engineer's report, in disregard of the plain provisions of the statute to which their attention was also repeatedly called.

Under the facts here appearing, it must be held that the reference to a limited tax rate in the engineer's report did not become a part of the contract between the district and the voters or taxpayers, that the provisions of the statute must prevail, and that there is no limitation upon the amount of taxes which may be levied insofar as the bonds here in question are concerned. There being no merit to any of the objections raised to the issuance of these bonds, it is the duty of the respondents to sign them as directed by their respective districts.

The demurrer is overruled. Let the peremptory writ issue as prayed.

Griffin, J., and Mussell, J., concurred.