[Civ. No. 8972. Third Dist. Jan 5, 1956.]

WALTER M. ROBBINS et al., Appellants, v. SONOMA COUNTY FLOOD CONTROL AND WATER CONSERVATION DISTRICT et al., Respondents.

Kasch & Cook for Appellants.

Joseph Maddux, District Attorney (Sonoma), George Herrington and Orrick, Dahlquist, Herrington & Sutcliffe for Respondents.

VAN DYKE, P. J.—Respondents herein have moved to dismiss the appeal.

Appellants began an action in the Sonoma County Superior Court wherein they sought to enjoin the issuance and sale of the bonds of Sonoma County Flood Control and Water Conservation District, respondent herein. By the second count of their complaint plaintiffs also sought declaratory relief. The trial court sustained a general demurrer, without leave to amend, and entered judgment that appellants take nothing. From that judgment they appeal. In opposition to the motion to dismiss, as opposed to the hearing of the appeal on the merits, appellants point out it is well settled law that courts are reluctant to dismiss appeals and will only do so under exceptional circumstances. Objections to disposition of appeals by motions to dismiss are well stated in *Chino Land etc. Co.* v. *Hamaker,* 171 Cal. 689 [154 P. 850]. Such motions require the attention of the appellate court to the appeals before they are reached in regular order and result in advancing the hearing of appeals over others preceding them on the calendar; consideration of the motion necessarily involves a full examination of the record and often, as in this

case, must be determined before the appellants have had opportunity to brief their appeal on the merits. Examination of the record, responsive to the motion in such a case, compels the court to make the same examination as would be necessary on hearing on the merits without the aid of such briefs. Unless justified by unusual facts, such a disposition of the appeal is unfair to other litigants whose appeals are being advanced regularly on the calendar and the granting of such motions, except in unusual situations, will cause the courts to be confronted with many such motions, the consideration of which would occupy much time that should be devoted to the consideration of earlier cases. On the other hand, appellate courts have inherent power to dismiss appeals which have no merit when that situation is presented on the face of the record and can be readily ascertained. Grave public interest can also justify such preliminary examination as is necessary to determine the presence or lack of merit. We are convinced that such factors of public interest do exist herein, and in view thereof and of the brevity of the record, consisting. as it does, of the complaint, the demurrer, the order sustaining the demurrer and the judgment entered thereon, we have felt justified in relaxing the usual rule governing such motions because this motion comes within the exceptions.

The general situation touching the validity of these bonds has been before the court in the respondent district's petition for a writ of mandamus directed to its treasurer, compelling him to issue and deliver the bonds to the buyer thereof, the proceedings having gone to the point of public sale of the bonds. The mandamus proceeding referred to is entitled "Sonoma County Flood Control and Water Conservation District, a body corporate and politic, Petitioner, vs. Jimmie Anderson, as County Treasurer of Sonoma County and ex officio Treasurer of Sonoma County Flood Control and Water Conservation District, Respondent." In that proceeding appellants herein were granted leave to and did intervene. The opinion of this court denying the issuance of the peremptory writ was filed December 9, 1955 (137 Cal.App.2d 698 [290 P.2d 660]), and discloses that this court did not there decide the issues presented upon the merits, since we were persuaded to deny the writ upon other grounds. However, in support of and in opposition to the granting of the writ in that proceeding, the merits of the issues therein posed were briefed. and considered by the court. Substantially the same issues

are presented on the appeal herein. Since we are convinced that the appeal herein is devoid of merit we have concluded that the motion to dismiss the appeal and to affirm the judgment appealed from ought to be granted.

By the first count of the complaint herein the following matters are alleged: Plaintiffs are citizens of the state, reside within the boundaries of respondent district and on real property therein which is subject to district taxation for the purpose of paying principal, interest and issuance expense of the subject bonds. They bring the action on behalf of themselves and all other taxpayers of the district. The questions to be litigated are of common and general interest to all owners of property in the district. The district is a body corporate and politic, with boundaries identical to those of the County of Sonoma and exists pursuant to the provisions of Chapter 994, Statutes of the State of California of 1949, as amended. On April 5, 1955 the district's board of directors adopted Resolution No. 6474, wherein it was stated: That the estimated cost to the district of the proposed Coyote Valley Dam to be erected in Coyote Valley in Mendocino County was $5,650,000, of which sum $5,598,000 was to be contributed by the district to the United States Government in payment of the district's share of the cost of construction of said dam, and $52,000 was to be applied toward the payment of costs of the bond proceedings; that the said total amount of $5,650,000 would be the maximum cost to the district of the proposed dam; that the district would contribute said sum of $5,598,000 to that cost. On the same date by Resolution Number 6475 the board called an election for May 10, 1955 on the question of incurring bonded indebtedness, the question being stated on the ballot form as follows:

"*Coyote Valley Dam*: Shall Sonoma County Flood Control and Water Conservation District incur a bonded indebtedness in the principal amount of $5,-650,000 for the purpose of paying the District's share of the cost of the Coyote Valley Dam to be constructed by the Corps of Engineers, United States Army, as more particularly described in House Document No. 585, 81st Congress, 2nd Session, . . ." (The resolution also stated a second proposition to incur bonded indebtedness in the sum of $8,500,000 for a water transmission system to distribute the water impounded by the dam.)

Further allegations of the complaint were as follows: The

election was held. The voters, believing, in reliance upon said resolutions and ballots, that the district's cost would not exceed $5,650,000, approved the incurring of bonded indebtedness in that sum and thus created a contract between all property holders in the district and the district that the cost of the dam to the district would not exceed that sum. The district thereafter offered the bonds for sale for the purpose of paying in full the district's share of the cost of the Coyote Valley Dam and the district would, unless enjoined, sell the bonds on the sale date, November 17, 1955, and thereafter pay the proceeds of the sale, less bond expense, to the Secretary of the Army of the United States. In truth and in fact, said the complaint, the payment of $5,598,000 to the Secretary of the Army would not pay the full share of the district's participation in the cost of the dam, which share would actually be $7,040,000, for these reasons: By Public Law No. 516 of the 81st Congress, approved May 17, 1950, it was provided that there was "authorized to be appropriated" $11,522,000 for the construction of the dam, providing the local interests, that is, the district, would first contribute $5,598,000 in cash, making a total cost of $17,120,000. The amount of this contribution was in fact based upon the formula of the district's paying 60 per cent of the total cost of the water conservation storage in the reservoir created by the dam which was then estimated at $9,220,000. Pursuant to the report of the Board of Engineers for Rivers and Harbors, dated April 22, 1949, as referred to in said Public Law No. 516, the United States is to pay the remaining 40 per cent of said cost. As of May 17, 1950 the estimated cost of the dam was $17,120,000, but at the present time the estimated cost of the identical dam has increased to $22,000,000. The district's share of 60 per cent of said total cost has automatically increased to at least $7,040,000, should Congress by subsequent legislation authorize further federal participation upon the same percentage basis. Congress has not authorized any other or further funds and if the district undertakes the entire cost of the dam over and above the amount so authorized to be appropriated by Congress the district will be required to contribute $10,482,000 to the cost of the dam. The sum of $17,120,000 is wholly insufficient to construct the dam and reservoir and the sum of $5,598,000 is wholly insufficient to pay the district's 60 per cent share of the district's storage conservation cost of the dam. Neither Congress nor the dis-

trict directors have made any provisions for costs of acquiring easements of flowage for the water to be impounded from the dam site to places of delivery along the Russian River or to the City of Santa Rosa or to other cities or users. By law the United States is forbidden to pay such costs. By the operation of the reservoir created by the dam great quantities of water will be released during the summer and fall seasons, so increasing the flow of the river as to damage banks, levees and properties of owners along the stream, and the district has no easement for such increased flow, but must acquire the same at a cost of at least $500,000. No provision has been made for the acquisition of such easements and bonds proposed to be issued and sold are not adequate to pay the district's share of construction and acquisition of such easements of flowage. Neither the district nor the United States holds any water rights to water proposed to be stored by the dam and a fundamental object and purpose of the propositions referred to the electors was to obtain said water for the use and sale by the district for irrigation, manufacture and domestic use, which purposes cannot be attained without ownership of water rights thereto. Hence the construction of the dam and the expenditure of the moneys from the sale of the bonds will be for an illegal and unlawful purpose and one for which the district has neither power nor authority. The district was not validly established and exists in violation of section 25 of Article IV of the state Constitution. If the bonds are sold the taxable property in the district must be assessed by the payment of interest and principal to the damage of all property owners.

By a second count, plaintiffs incorporated by reference all the allegations hereinbefore set forth and alleged that a dispute or controversy had arisen between themselves and the district with respect to the same matters in that plaintiffs contended the issuance and sale of the bonds and the payment of moneys procured therefor to the Secretary of the Army would be unlawful acts. It is not necessary to state in detail the conclusions of the plaintiffs as to why such acts would be unlawful. The count for declaratory relief does no more than restate the issues advanced by the first count.

It is at once apparent that plaintiffs have placed their own construction by way of conclusionary allegations upon the effect of public laws and the record of public acts of the governmental agencies involved, both federal and state. Since courts take judicial notice of such matters, such a pleading

must be tested, not by what it says as to the effect of such laws and acts, but by the contents of the laws and acts themselves.

House Document Number 585, 81st Congress, 2d Session, specifically referred to in the ballot form, is devoted to the consideration given over a long period of time by the federal government to the matter of flood control and related projects on the Russian River. Therefrom it appears that, pursuant to legislative authorization, the Chief of Engineers of the United States Army had, under date of November 15, 1949, submitted to the Secretary of the Army for transmission to Congress his report on preliminary examination and survey of the Russian River, California, as authorized by the Flood Control Act, approved August 28, 1937; that after consideration of the needs for flood control and water conservation on the river a plan had been proposed for ultimate improvement which provided for construction of Coyote Valley Dam and reservoir on the east fork of the river, Dry Creek Dam and reservoir on a tributary of that name, and channel stabilization works along the river. Reservoir data and estimated costs for the proposed ultimate plan were given. It was recommended that the United States adopt a project for flood control and allied purposes, including the construction, as an initial stage of the whole project, of the Coyote Valley Dam at an estimated cost of $17,150,000. The whole project was estimated to cost $40,460,000. It was proposed as to the initial stage that local interests should give assurances satisfactory to the Secretary of the Army that there would be established a properly constituted public body to be responsible for fulfilling stated requirements of local cooperation, including a contribution toward the cost of construction of Coyote Valley Dam and reservoir which would be in payment of the cost of water conservation storage provided thereby; and that the contribution to be made be fixed at 57.4 per cent of the total actual first cost, but not to exceed $9,330,000, in 40 equal annual installments, with the privilege of paying in a lump sum the present worth thereof calculated with interest at 3 per cent. We may say here that later on it was required that this contribution should amount to the exact total sum of $5,598,000, as alleged in the complaint. That sum is 60 per cent of $9,330,000. It was required also that the sum be paid over to the Secretary of the Army in cash before work on Coyote Valley Dam was begun. It is unnecessary to go into the contents of the House

Document in detail. It will suffice to state that various agencies, including the Bureau of the Budget, the State of California, the Department of the Interior, the Federal Power Commission and the Department of Agriculture, all participated in the working out of a proposed plan for flood control and water conservation in the Russian River Basin. In 1949 the California Legislature passed an act (Act 7757. Deering's Water Code) creating the respondent district, declaring its purposes and powers to be the controlling, conservation, diversion, storage and disposition of storm, flood and other surface waters and declaring that it was necessary that the district be created by special law. Among the stated reasons for special legislation the Legislature declared that the district was subject to periodical floods from the waters of the Russian River, which river was an important potential source of water for various uses inside and outside its watershed; that the United States Army Engineers had made studies and recommendations for a proposed plan of improvement for flood control and allied purposes on the river and had recommended the immediate forming of a political entity to satisfactorily deal with the federal agencies; that investigation had shown that conditions in the County of Sonoma are peculiar to that county and that a general law could not be made applicable thereto. Section 3, defining the objects and purposes of the district, declared in subsection (r) that among those purposes was that of cooperating with the United States under the Federal Reclamation Act of June 17, 1902, and any other act of Congress permitting cooperation for the purpose of constructing works of irrigation, drainage and flood control. The district was given for such purposes all the powers possessed by irrigation districts as set out in Chapter 2, Part 6 of Division 11 of the Water Code. In 1953 the Legislature passed an act now appearing as section 12698 of the Water Code, declaring that the project on the Russian River for flood protection and water conservation in Sonoma and Mendocino counties was adopted and authorized substantially in accordance with the recommendations of the Chief of Engineers in said House Document No. 585.

It is apparent from a consideration of the pertinent laws and public acts that the control and use of the waters of the Russian River has long been the subject of government concern, both state and federal, and that there has been a determination, as set forth in the House Document referred to, that the most feasible method of controlling and using the

waters of the river lay in the cooperative action of the governmental agencies; that Congress by Public Law No. 516 has approved the carrying out of a definite and ultimate plan for the control of the river and the use of its waters and has authorized appropriations to defray the cost of the initial stage thereof; that among the requirements, however, was that of cooperation by a state agency to be created, which cooperation should include a direct cash contribution of a set sum of $5,598,000 to be furnished by the local agency prior to the initiation of construction work on Coyote Valley Dam, which sum was to be paid over to the Secretary of the Army for use in defraying costs of that initial stage of the whole project. The language used was:

"The plan for flood control, water conservation, and related purposes in the Russian River Basin, California, is hereby approved substantially in accordance with the recommendations of the Board of Engineers for Rivers and Harbors dated April 22, 1949, and as recommended by the Chief of Engineers in his report dated November 15, 1949, and there is authorized to be appropriated the sum of $11,522,000 for accomplishment of the initial stage of the plan: *Provided,* That section 8 of the Flood Control Act of 1944 shall apply to this project: *Provided further,* That prior to starting construction, local interests shall contribute the sum of $5,598,000 in cash *in full repayment of the conservation benefits: And provided further,* That such contribution of $5,598,000 shall be transferred to the Secretary of the Army for application to the cost of construction of the project."

Turning now to the allegations of the complaint wherein appellants charge the invalidity of the proceedings taken and proposed with respect to the bond issue, they may be segregated and treated as follows:

1. The resolutions calling and authorizing the bond election and the ballot form used, and the favorable vote evidence a contract between the district and the property owners therein that the cost to the district of its participation in the Coyote Valley Dam will be limited to $5,598,000; if these bonds are issued and sold that contract will be breached because no such limitation exists. It has often been declared in the case law of our state that a proposal on the part of officers of a district such as respondent district is to incur a bonded debt, together with the approval of the electors, creates a status analogous to a contractual relation which is entitled to protection under the Constitution. (*Los Angeles County Flood*

*Control Dist.* v. *Wright,* 213 Cal. 335, 349 [2 P.2d 168] ; *Peery* v. *City of Los Angeles,* 187 Cal. 753 [203 P. 922, 19 A.L.R. 1044] ; *O'Farrell* v. *County of Sonoma,* 189 Cal. 343, 348 [208 P. 117].) But herein appellants have a wholly erroneous concept as to what the contract is. We have already, by reference to the pertinent laws and the recorded public acts, said that the United States had declared its intention to construct works for the control, conservation and use of the waters of the Russian River, including the construction of the Coyote Valley Dam, and had set up a condition that local interests must initially contribute the stated sum in full payment of their share of the cost of the initial stage, the construction of Coyote Valley Dam. The federal government had clearly stated that, so far as demands of the federal government upon such interests be concerned, the stipulated contribution when made would be payment in full of the local interests' share. There was, therefore, and could be, no merit in appellants' contentions that the issuance of the bonds would do violence to the existing contractual status.

2. That the cost to the district for its participation in the construction of the dam would be in fact not less than $7,040,-000 and up to $10,482,000, constituting, as alleged, "a threatened breach of contract between the district and the property holders therein." What we have already said disposes of this claim of illegality.

3. That if the cost to the district in participating in the Coyote Valley Dam is to exceed $5,598,000 it is necessary that the resolutions and bonds issued, if any, be cancelled and a new election authorized, stating to the property owners the actual amount of the district's contribution to the cost of Coyote Valley Dam and the cost and expense of easements of flowage. What we have already said disposes of the first part of this claim of illegality. ▮ The rest of the claim relating to cost and expense of easements of flowage is without moment here. The outlay for easements were not within the embrace of the district's proposal to its electors. It is, of course, true that the bond issue proposed and voted would not provide funds wherewith to procure easements of flowage and the acquisition of kindred necessary rights, but authority to incur indebtedness therefor was not asked of the electors. They were told that the district wished to incure a bonded indebtedness for the purpose of defraying the district's share of the cost of the Coyote Valley Dam as that project was particularly described in House Document Number 585 which we have heretofore discussed ; and they knew, therefore, that when

they had paid their share of the cost of constructing that dam and when the federal government, in carrying out its part of the over-all project, had constructed the dam the water would be stored. Of course the stored water would be available for use only when and if necessary easements and diversion and transportation works had been acquired and constructed. All of these matters appear in House Document Number 585, to which the electors were referred, but they were no part of the contractual status proposed. This must be held to have been known to every elector whose approval was sought and registered at the election. (*Los Angeles County Flood Control Dist.* v. *Wright, supra,* p. 349.)

4. That the board of directors of the district have no authority to sell the bonds. The complaint does not challenge the regularity of the proceedings taken by the district leading up to the authorization by the electors for the issuance and sale of the bonds. This claim of illegality then is dependent upon the other claims which we have discussed. The same must be said of the contention that the treasurer of the district has and will have no authority to legally disburse or pay over or transfer the proceeds of the sale of the bonds to the Secretary of the Army. Such disposition of the proceeds of sale of the bonds was part and parcel of the proposal of the district and was approved by the electors.

5. That the estimated cost of the proposed work and improvements made and makes no allowance for over $500,000 alleged expense for flowage easements which must be acquired and cannot be paid for by the United States and are not provided for by the State of California. No authority to incur indebtedness in that or any amount for expense of flowage easements was asked of the electors by the district.

6. That neither the district nor the United States owns or holds water rights to the waters to be impounded and hence the construction of the dam is beyond and outside of the powers and authority of the district. Once again, authority to incur indebtedness for the acquisitions of such rights and properties, however necessary they may be to the ultimate realization of benefits from the project, were not asked of the electors. The conclusion that participation by the district in the cost of such acquisitions is outside its powers and authority as a district is false, as is amply demonstrated by the powers granted the district by the special legislative act by which it was created.

7. That the district is not a proper entity, having been created by an act in violation of the Constitution of the State

of California. We do not believe this claim of illegality needs extended treatment. Flood control and water conservation districts have been created by special act on numerous occasions and the legality of such creation has been upheld. (*Alameda County Flood Control & Water Conservation Dist.* v. *Stanley,* 121 Cal.App.2d 308, 314 [263 P.2d 632] ; *American River Flood Control Dist.* v. *Sweet,* 214 Cal. 778 [7 P.2d 1030] ; *Monterey Peninsula Airport Dist.* v. *Mason,* 19 Cal.2d 446 [121 P.2d 727].)

█ Appellants argue that there is no contract binding the United States after the receipt of the district's contribution to do any part of the work contemplated on and along the Russian River. In a broad sense that is true. We may assume that if the contributed sums were neither used for the purposes for which they were raised nor returned to the district no way exists whereby the district could compel devotion to such use or reimbursement. It is argued that there is and can be no assurance that the estimated cost of the work will bear any reasonable relation to actual costs and that already the costs, as estimated and alleged by plaintiffs, have increased most materially over the estimates made by the public agencies involved. That also may be assumed to be true. But such considerations are not material here nor do they, nor can they, affect the legality of the bonds proposed to be issued and sold. The possibility of such mischances may well have been valid arguments to the voters to persuade them not to authorize the district to incur the proposed indebtedness, and it may well be that they were urged upon all by those who opposed the debt. They are not, however, material here where the attack is upon the validity of what has been and what is proposed to be done and not upon the advisability thereof.

█ Appellants direct our attention to the well settled rule that on appeal a judgment based upon the sustaining of a demurrer without leave to amend will not be affirmed unless it appears not only that the complaint as demurred to fails to state a cause of action, but also that it cannot be amended to do so. We have not been unmindful of this rule. We have already held that the complaint did not state a cause of action. In considering the possibility of amendment, however, we can consider what can be truthfully alleged in support of the general attack on the validity of the proceedings taken to incur the bonded debt in the light of pertinent laws and public acts wherein the entire project has been author-

ized by Congress with the concurrence of the state Legislature and other public agencies of the state. These matters have been hereinbefore set forth and from a consideration of them all we feel fully justified in saying that this complaint cannot be amended to state a cause of action; that this bonded indebtedness has been legally created and that, far from being enjoined from performing their ministerial duties to issue, sell, deliver and dispose of the proceeds of sale of these bonds, the appropriate officers of the district could be mandated to do so.

For the reasons given the appeal is dismissed and the judgment appealed from is affirmed.

Schottky, J., and Peek, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 29, 1956.