[No. 16003.    In Bank.—June 22, 1895.]

# W. G. SKINNER, APPELLANT, v. CITY OF SANTA ROSA ET AL., RESPONDENTS.

MUNICIPAL CORPORATIONS — UNAUTHORIZED ISSUANCE OF BONDS — DE-
PARTURE FROM NOTICE OF ELECTION—CHANGE IN TERMS OF PAYMENT
—INJUNCTION.—Where a notice of election held under the act of 1889,
as amended in 1891, which authorizes the incurring of indebtedness by
municipal corporations for the construction of water-works and other
improvements, notified the electors that the bonds to be issued were to
bear annual interest at the rate of four per cent per annum, and to be
payable at the office of the city treasurer, an ordinance passed after the
result of the election was ascertained changing the form of the bonds so
as to make them payable in the city of New York, in gold coin of the
United States, with interest at four per cent per annum, payable semi-
annually in gold coin, the departure in the ordinance from the notice of
election is fatal to the validity of the bonds provided for in the ordi-
nance, and the sale and delivery thereof will be enjoined.

ID.—DEPARTURE FROM RATE OF INTEREST.—The common council cannot
depart at all from the rate of interest submitted to the voters, and a
provision for the payment of interest semiannually, under a notice of
election stating that interest was to be payable annually, is an unau-
thorized increase of the rate.

ID.—PLACE OF PAYMENT—KIND OF MONEY—SUBMISSION TO ELECTORS.—
Although the place of payment and the kind of money in which the
bonds are to be paid, are not necessary to be submitted to the voters,
yet, if they are submitted, the vote authorizing the indebtedness to be in-
curred imports the particulars named as the conditions upon which the
assent of the voters has been given; and, where the question arises before
the bonds have been delivered, the city has no power to issue them in a
form which does not substantially comply with the terms stated in the
ordinance of submission and notice of election.

APPEAL from a judgment of the Superior Court of Sonoma County.

The facts are stated in the opinion of the court.

*W. T. Russell,* for Appellant.

*J. W. Goodwin,* and *F. Cowan,* for Respondent.

*Rodgers & Paterson, A. B. Ware,* and *C. S. Farquar, amici curiæ.*

THE COURT.—The controversy herein was submitted to the superior court upon an agreed case, under the provisions of section 1138 of the Code of Civil Procedure.

The city of Santa Rosa, desiring to construct a system of water-works, the estimated cost of which is stated at one hundred and sixty-five thousand dollars, proposed to raise that sum by the sale of the bonds of the city, to be issued under the provisions of the act of 1889, authorizing the incurring of indebtedness for the construction of water-works and other improvements. (Stats. 1889, p. 399, as amended Stats. 1891, p. 94, and Stats. 1893, p. 61.)

The several ordinances required by the statute were duly passed and published, the notice of election given and the election held, at which more than two-thirds of the electors voting thereat voted in favor of the issuance of the bonds.

Ordinance 148, calling said special election, described the bonds proposed to be issued as serials, payable in gold coin or lawful money of the United States, in the manner following: "One-fortieth part of the whole amount of said indebtedness so incurred, together with annual interest at the rate of four per cent per annum on all unpaid sums thereof, shall be payable each and every year on a day in each year, and at a place to be fixed by the common council of said city, until the whole amount of said indebtedness shall have been paid."

The notice of election contained the foregoing description of the bonds proposed to be issued, and, in addition, declared as follows: "Each bond shall have attached thereto a separate coupon for the interest for every year

that such bond has to run, and each of said coupons shall be made therein payable, and shall be payable, at the office of the city treasurer of said city of Santa Rosa on the first Monday of December of the year for the interest whereof it is given. Each of said bonds shall therein be made payable, and shall be payable, at the office of the city treasurer in the city of Santa Rosa on the first Monday in December of each year."

The notice of election also stated the precise amount of the annual tax to be levied to pay the annual interest and the series of bonds falling due each year, thus: " First year, $10,725 "; " second year, $10,560 "; and so on down to the " fortieth year, $4,290; the aggregate tax levy for the forty years being $300,300."

On June 6, 1893, after the result of the election was ascertained, the city council adopted ordinance No. 149, which recited all the previous proceedings, and prescribed the form of the bonds in exact conformity to all the particulars stated in the notice of election.

The agreed statement then recites the steps taken to sell said bonds, and adds: " That neither said legislative body, nor said city, nor any of the officers, received any bids for said bonds in answer to the notice so published; that said legislative body used strenuous efforts to sell such bonds, but was unable to find any purchaser therefor."

The statement then recites that, in view of the great needs of the city for a system of water-works, the city council, on November 17, 1894, passed ordinance No. 156, rescinding ordinance 149, and changing the form of the bonds so as to make them payable at the Chemical National Bank in the city of New York " in gold coin of the United States of America of the present standard of weight and fineness," with interest at the rate of four per centum per annum, " payable semiannually in like gold coin."

The bonds in this new form were executed, and on December 1, 1894, Robert Effey, a party to this agreed case, bid for said bonds their face va'ue in United

States gold coin, and the city council, having accepted his bid, were about to deliver the bonds to him, when W. G. Skinner, describing himself as a taxpayer of said city, served upon the city council and each of the officers of said city a protest against the sale of said bonds to Effey, in which he notified them that he would use every lawful means to resist the collection of any tax levied for their payment, and that he would apply to the court for an injunction to restrain the collection of a tax levied on October 5, 1894, of twenty-five cents on each one hundred dollars to pay the principal and interest due on said bonds for the year 1894 and the interest due June 1, 1895.

The city council thereupon passed a resolution directing the city attorney to take immediate steps to unite with such officers and persons as were interested in submitting an agreed case, " so as to obtain, as soon as possible, the judicial determination of said question, case, and controversy in and by the supreme court of this state."

The foregoing outline of the statement, as originally prepared, contains all of it that is material. It closed with the statement that " The foregoing is a full, true, and correct statement and case containing all the facts upon which the controversy depends," and signed by counsel for the respective parties, and followed by the affidavit of Skinner to the effect that the controversy is real and the proceedings in good faith.

The contention on Skinner's part, as appears in the agreed case, is: 1. That the city council have no power to issue the bonds in the form prescribed by ordinance 156; 2. That the council had no power to levy the tax of twenty-five cents per one hundred dollars on October 5, 1894, the bonds then authorized under ordinance 149 not having been sold; 3. That ordinance 153, authorizing the city marshal to collect delinquent taxes by sale of the property, is invalid, because in conflict with the city charter, which makes it the duty of the city

attorney to collect them by suit, the marshal having advertised his property for sale on December 17th.

Certain amendments were afterward made to the statement, viz: That the said tax levy of twenty-five cents, together with other ·city taxes levied for the current year, do not exceed one per centum of the assessed valuation, and are less than the limit fixed by law; that Skinner had tendered all other taxes; that there had been a sufficient amount of said twenty-five cent tax voluntarily paid into the city treasury to meet the semiannual interest accruing prior to the next annual tax levy; and "that at the time of the levy of said twenty-five cent tax an offer to purchase for the face value thereof, in United States gold coin, said bonds to be issued under ordinance No. 149, had been presented to said common council, which offer was thereafter withdrawn."

Judgment was rendered that bonds issued under ordinance 156 would be valid, and also affirming the validity of said twenty-five cent tax, and from this judgment said Skinner appeals.

The question, "Are the bonds which, the city council intended to issue valid in the form proposed?" must be answered in the negative.

No question is made as to the regularity of the proceedings up to and including ordinance No. 149, nor that bonds issued under that ordinance and in the form therein prescribed would have been valid, but the bonds proposed to be issued under ordinance 156 do not conform to the ordinance calling the election, nor to important particulars specified in the notice of election, and in one of these particulars they do not conform to the statute under which it is proposed to issue them.

The ordinance calling an election and the notice of election each provided that the bonds to be issued, if the qualified voters should authorize their issue, should bear interest at the rate of four per centum per annum, and the principal and interest should be payable " in gold coin or lawful money of the United States," and the

notice of election specified, in addition, that the bonds, as well as the interest, should be payable at the city treasury.

The statute under which said bonds were proposed to be issued is the act approved March 19, 1889 (Stats. 1889, p. 399), and the amendments thereof hereafter noticed.

By section 2 of said act, as amended in 1891 (Stats. 1891, p. 94), it is provided, among other things, as follows: " The ordinance calling such special election shall recite the objects and purposes for which the indebtedness is proposed to be incurred, the estimated cost of the proposed public improvement, and that the bonds of the municipality shall issue for the payment of the cost of such improvement, as in such ordinance set forth, if the proposition be accepted by the qualified voters, as hereinafter provided."

Section 3 of said act (Stats. 1889, p. 400) provides for the publication of said ordinance calling such election, and that after such publication there shall be published not less than two weeks " a notice of such special election, the purpose for which the indebtedness is to be incurred, the number and character of the bonds to be issued, *the rate of interest to be paid*, and the amount of the tax levy to be made for the payment thereof."

By section 6 of said act, as amended March 1, 1893 (Stats. 1893, p. 61), it is provided, among other things, that such bonds " shall be payable in gold coin or lawful money of the United States."

Section 7 (Stats. 1889, p. 401) provides: " The legislative branch of any city, town, or municipal corporation issuing bonds under the authority of this act shall have the right to determine the rate of interest such bonds shall bear; *provided*, that in no case shall it exceed seven per cent per annum, and to name the date and place where such bonds and interest shall be paid; *provided*, that the place of payment shall be either at the office of the treasurer of the municipality or at some

designated bank in San Francisco, Chicago, New York, or Boston."

From this review of the statute it will be seen that the rate of interest the bonds shall bear, and the amount of the tax levy to be made for the payment thereof, are expressly required to be stated in the "notice of election," while the place of payment and the kind of money in which they are to be paid are not. The ordinance calling the election and the notice of election fixed the rate of interest at four per cent, payable annually, while ordinance 156, under which the bonds in controversy are proposed to be issued, fixes the rate at four per cent, payable semiannually.

It is contended by respondents, if we correctly understand them, that as section 7 of the act above cited leaves the determination of the rate of interest to the common council, and as by section 6 it is provided that interest may be payable annually or semiannually, making the interest payable semiannually instead of annually is a "mere matter of detail, to be arranged between the buyer and the city, and, being confided to the discretion of the council, it was not within their domain to limit or circumscribe that discretion in any way, but that it was their duty to use their best judgment when they were called upon to act."

That the payment of interest semiannually increases the rate is obvious. If it did not, purchasers would not be likely to insist upon it. It therefore becomes part of the rate; and, while the council are authorized to fix the rate, the rate of interest, as well as the main question of incurring the indebtedness for the purpose specified, is required to be submitted to the voters. The maximum rate authorized by the statute is the legal rate of interest allowed in this state, which is now seven per cent. Putting an extreme case, it will not be contended that if the proposition submitted to the voters at such election specified the rate to be paid at two per cent, that the common council might, in their discretion, issue bonds bearing seven per cent. But, if the

common council can depart at all from the rate of interest submitted to the voters, no limit, save the rate fixed by the statute, can define their power.  Counsel for respondent cite the case of *Yesler* v. *City of Seattle*, 1 Wash. 308, and quote four or five pages therefrom.  In that case the ordinance of submission fixed the rate of interest at five per cent.  So far as the rate of interest is concerned that case is not in point, inasmuch as the statute there did not require the rate to be stated in the ordinance of submission or notice of election.  In that case, however, other particulars not required to be stated in the ordinance of submission were specified, and some of them were conditions not named in the statute.  As to these particulars which were not required to be submitted to the voters, the case supports respondent's contention, and is in point so far as the place of payment is concerned.  The argument upon which that decision rests is that the legislature delegated to the common council, the municipal legislature, with the assent of its constituents, the power to contract the indebtedness, "it being the sole judge of the proper method, whether by bonds or warrants, or open account, confidence being reposed in the wisdom and honor of its members that they will act for the best interests of the community.  Nor does the law permit the council of a city to delegate to the popular vote the determination of any matter before it, unless the right to so delegate it has been expressly conferred or enjoined by statute. . . . .  Therefore, we conclude that the council could lawfully submit to vote only those matters directed to be submitted by its superior authority—the legislature."

We cannot assent to the conclusion reached by the learned justice who wrote the opinion, nor to the argument by which it is reached.  The opinion concedes that, under the constitution and laws of that state, no indebtedness can be incurred beyond a certain limit without authority expressed at an election duly held for that purpose; so that the real question to be determined

is, Has that assent been given? It is quite true that in that case, as in this, particulars were inserted in the submission which the statute did not require to be submitted; but these particulars having been submitted, the vote authorizing the indebtedness to be incurred imports the particulars named as the conditions upon which that assent has been given, and hence no one can say that without these favorable conditions the result of the election would have authorized the indebtedness to be incurred. The rate of interest, the place of payment, the kind of money in which payment must be made, would influence any business man in determining whether he should incur a personal debt, and must do so when he is called upon as a voter to determine whether he will favor his municipality incurring a debt for the payment of which, in common with others, his property is liable to taxation. He might readily consent, upon very favorable terms being offered or proposed, and strenuously oppose it if the terms were unfavorable or were uncertain. If the terms and conditions submitted to the electors may be departed from, and such election held to authorize the issuance of bonds under other terms and conditions, a door will be opened authorizing the common council to submit a proposition so favorable as to secure beyond question a favorable vote, and then change the conditions as to rate of interest and otherwise, even without any fraudulent purpose or intent, so that, if again submitted, an overwhelming defeat would result.

The logical inference from the case above cited is, however, that, as to all matters *required* to be submitted, such submission measures the authority of the common council.

The case of *Moore* v. *City of Walla Walla*, 60 Fed. Rep. 961 (circuit court, district of Washington), so far as the above questions are concerned, follows the decisions of the state court, which are of binding force in the federal court, and is therefore not an independent authority,

and lends no weight to *Yesler* v. *City of Seattle, supra,* which it cites.

What has been said applies as well to the place of payment and the exact statement of the amount to be levied each year of the forty years as to the interest, so far as its influence upon the vote is concerned.

Upon the question as to the change made in the kind of money in which the bonds and the interest thereon are to be paid, it should be observed that, prior to the amendment of March 1, 1893 (Stats. 1893, p. 61), the statute was silent as to the kind of money in which payment should be made, but that amendment requires that the bonds and interest "shall be payable in gold coin or lawful money of the United States."

Several cases are cited by counsel for respondents, to the effect that a grant of power to a municipal corporation to issue bonds, without limitation as to the kind of money in which they shall be payable, confers authority to make them payable " in gold coin of the United States, of the present standard weight and fineness." (*Judson* v. *City of Bessemer,* 87 Ala. 240; *Trustees of University* v. *Moody,* 62 Ala. 389; *Moore* v. *City of Walla Walla,* 60 Fed. Rep. 961.)

Prior to the amendment of 1893, above stated, the power to make the bonds payable "in gold coin of the present standard of weight and fineness," or in any other kind of coin or currency, could not be controverted. There was no restriction. The power to determine that question was as ample as that of a natural person to stipulate in what his personal obligation should be paid. The amendment must therefore have been intended to restrict that power, and this was done by expressly stating the kind of money in which alone they "shall be " made payable. Whether the increased value of the bonds caused by the stipulation that they shall be paid in gold coin of the present standard of weight and fineness would equal or exceed any probable appreciation of gold cannot control the express provision of the statute in that regard.

But it is contended that if the act gave the council no power to make the bonds payable in gold coin of the present weight and fineness that clause would be void, and that in such case it would be the duty of the treasurer in paying the bonds to pay them in the kind of money required by the statute, and cites the case of *Enfield* v. *Jordan*, 119 U. S. 680. That case, however, related to the place of payment. The court said: "The objection that the bonds are illegally made payable at a bank in Chicago does not invalidate them. The agreement to pay at the place is void, but the balance of the coupons and bonds are not rendered invalid for that reason. In paying the interest the treasurer should not obey that agreement in the bond, but pay it at the treasury of the city."

But this does not, nor do any of the cases cited by counsel, meet the question here presented as it is presented. The question in that case, as in the cases cited from the supreme court of Illinois, arose between holders of municipal bonds and the municipality that had issued them and received the value of them. Two of these cases related to the place of payment, and two involved bonds purporting to bear a rate of interest greater than that authorized by the statute, and in these cases it was held that the holder could recover the authorized rate and no more. The question whether the bonds, if issued, would be void in the hands of a holder for value is not the test or measure of the right of a taxpayer of the city to enjoin the issue of them. It may well be that the purchaser is bound to know whether the rate of interest specified in the bond is within the limit fixed by the statute; but the rate being within the statutory limit, it does not follow that he may not rely upon the recitals in the bond as to the *regularity* of the proceedings by the municipality in fixing the rate specified, or that such recitals will not, in favor of the bondholder for value, bind the corporation. The distinction between the question now under consideration and that which would arise in an action by a *bona fide* holder of

one of these bonds is noticed by the supreme court of
the United States in the leading case of *Knox* v. *Aspin-
wall*, 21 How. 539, where, after quoting the recitals of
the bond showing that it was issued by authority, it was
said: "The purchaser was not bound to look further for
evidence of a compliance with the conditions to the
grant of the power"; and afterward further said: "We
do not say that the decision of the board would be con-
clusive in a direct proceeding to inquire into the facts
previously to the execution of the power, and before the
rights and interests of third parties had attached; but,
after the authority has been executed, the stock sub-
scribed, and the bonds issued and in the hands of in-
nocent holders, it would be too late, even in a direct
proceeding, to call it in question."

*Knox* v. *Aspinwall, supra*, has been cited and followed
in a very large number of cases in that and other courts,
and, as applied to the facts of that case, has not been
doubted. In a later case, *Coloma* v. *Eaves*, 92 U. S. 484,
the rule was more cautiously stated, thus: "Where legis-
lative authority has been given to a municipality, or to
its officers, to subscribe to the stock of a railroad com-
pany, and to issue municipal bonds in payment, but
only on some precedent condition, such as a popular
vote favoring the subscription, and where it may be
gathered from the legislative enactment that the offi-
cers of the municipality were invested with power to
decide whether the condition has been complied with,
their recital that it has been, made in the bonds issued
by them and held by a *bona fide* purchaser, is conclu-
sive of the fact and binding upon the municipality, for
the recital is itself a decision of the fact by the ap-
pointed tribunal."

Respondents' argument that the bonds would be valid,
at least to the extent of four per cent annual interest,
payable "in gold coin or lawful money of the United
States," at the office of the city treasurer, is a virtual
concession that the bonds in the form prescribed in
ordinance 156 are not authorized by the proceedings;

and if that be true they should not be issued. While, if they would be valid in the hands of a *bona fide* holder so that he could compel payment in gold coin of the present standard of weight and fineness, with interest in like coin, payable semiannually, in the city of New York, a burden would be imposed upon the taxpayers to which they have not assented, and they should not be allowed to issue.

Counsel refer to the case of the controversy between Derby and the city of Modesto. (*Derby* v. *Modesto,* 104 Cal. 515.)

In that case the bonds had been sold, the purchase money paid into the treasury, and the controversy arose more than a year afterward. One point then urged by the taxpayer was that the bonds provided for the payment of semiannual interest. In reply to this contention it was said: " The statute provides that the trustees shall have the right to determine the rate of interest such bonds shall bear, provided that in no case shall it exceed seven per centum per annum. The time at which the interest is to be paid, whether annually or semiannually, affects the rate of interest, and is within the power conferred upon the board by the statute, and the rate being within the statutory limit the bonds are valid as against this objection."

The facts should have been more fully stated upon that point. The ordinance of submission and the notice of election both provided for semiannual interest, precisely as stated in the bonds, but the statute at that time was silent as to the payment of interest semiannually, and the contention was that in providing for semiannual interest the statute had not been followed.

In the case at bar, where the question arises before the bonds have been delivered, we hold that the city has no power to issue them in a form which does not substantially comply with the terms stated in the ordinance of submission and notice of election, and with the statute under which the proceedings were had.

It becomes unnecessary to discuss the remaining questions brought up by the record.

For the reasons given in the foregoing opinion it is ordered that so much of the judgment appealed from as affirms the validity of the bonds proposed to be issued under said ordinance 156 be reversed, and cause remanded with directions to enter a judgment enjoining the sale and delivery thereof.

Rehearing denied.