[Civ. No. 30416. First Dist., Div. One. Jan. 3, 1972.]

RICHARD H. TOOKER et al., Plaintiffs and Appellants, v.
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT et al.,
Defendants and Respondents.

[Civ. No. 30605. First Dist., Div. One. Jan. 3, 1972.]

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,
Petitioner, v.
W. F. GOELZ, as Treasurer, etc., Respondent.

[Consolidated Cases.]

## COUNSEL

Thomas H. Crawford and Michael B. Wilmar for Plaintiffs and Appellants in No. 30416.

Thomas M. O'Connor, City Attorney, Edmund A. Bacigalupi, Deputy City Attorney, and William F. Bourne for Petitioner in No. 30605 and for Defendants and Respondents in No. 30416.

Richard L. Romano for Respondent in No. 30605.

## OPINION

**ELKINGTON, J.**—We have consolidated for hearing and determination two related proceedings pending before this court, to each of which San Francisco Bay Area Rapid Transit District (BART) is a party. The first (1 Civ. 30416) is an appeal by one Tooker and others from an order of the San Francisco Superior Court denying their application for a preliminary injunction. The second proceeding (1 Civ. 30605) is an application by BART for a writ of mandate against W. F. Goelz, the treasurer of BART.

BART, as is well known, is a rapid transit district, the facilities of which are now under course of construction, formed of San Francisco, Alameda, and Contra Costa Counties.

*The Relevant History of BART*

BART was created by the "San Francisco Bay Area Rapid Transit District Act" (hereafter the "Act") codified as sections 28500 et seq., of the Public Utilities Code. Hereafter all statutory citations will be to that code. By the Act BART was authorized to incur a bonded indebtedness for the construction and operation of a rapid transit system (§ 29150). However, before any bond proposal could be put forward for vote in the affected counties, section 29151 required BART to:

"[E]mploy such engineers, economists, fiscal experts and others as is necessary to develop general plans, estimates and general specifications pertaining to the projects for which the bond issue is proposed, sufficient in the opinion of the board to enable the board to determine the feasibility of such projects, . . ."

Section 29152 of the Public Utilities Code outlines the required contents of the feasibility report as follows:

"Such engineers, economists, fiscal experts and others shall make reports to the district, which shall include:

"(a) A general description of the facilities to be acquired or constructed from the proceeds of the proposed bond issue.

"(b) The estimated total cost of constructing or acquiring, or both, such facilities.

"(c) The estimated period of construction of such facilities.

"(d) An estimate of the revenues which may be expected to be derived therefrom.

"(e) The amount of bonds which will be required to pay the estimated total cost of constructing or acquiring such facilities. If the district determines to make interest payments out of bond proceeds, the estimate may include a sum sufficient to pay interest on the bonds during the estimated period of construction and for three years, or less, thereafter.

"(f) An estimate of the taxes required to be levied for all district purposes, the sources from which such taxes shall be obtained, and the proportion or amount to be derived from each source."

Pursuant to sections 29151 and 29152 BART employed "engineers,

economists, fiscal experts and others." These persons reported in a document entitled "The Composite Report, Bay Area Rapid Transit, May 1962" (hereafter "Composite Report"). It was accepted and approved by BART.

The Composite Report provided: "The Composite Report, Bay Area Rapid Transit, May 1962, describes this general system and determines the engineering feasibility of this general system. Construction plans and specifications remain, of course, to be prepared before construction bids are obtained and construction begins; and circumstances then existing may well result in some variations within this general framework."

It also provided: "The San Francisco Downtown element of the Bay Area regional rapid transit system consists of a four-track, two-level subway beneath Market Street from the Trans-Bay Tube to Van Ness Avenue and a two-track, single-level subway from Van Ness Avenue to the existing Twin Peaks Tunnel. [¶] West of Twin Peaks a rapid transit subway for initial use by streetcars is planned extending from the existing Twin Peaks Tunnel to a point just west of St. Francis Circle where surface operations resume. The West Portal Station is in subway in West Portal Avenue at Vicente Street. Ramp connections to surface streetcar operations are included in Ulloa Street and Junipero Serra Boulevard. This section west of Twin Peaks is identified as the Twin Peaks Line."

We observe at this point that the Composite Report did *not* expressly plan for an "Embarcadero Transit Station" in San Francisco.

Pursuant to section 29153 BART declared the proposed plan set forth in the Composite Report to be feasible and directed the report to be referred to the boards of supervisors of each county comprising BART for their approval, as provided in section 29154. The report was thereupon also approved by the respective county boards of supervisors.

Thereafter BART by resolution called a special bond election in its district. In compliance with section 29159 subdivision (a), and as pertinent, the resolution, among other things, provided:

"Section 2. A statement of the general object and purpose of incurring said indebtedness as set forth in said measure is as follows: By incurring said indebtedness the District will be in a position to acquire, construct and complete a mass rapid transit system connecting the City and County of San Francisco, Alameda County and Contra Costa County. The San Francisco downtown element of the rapid transit system will connect with the San Francisco approach to the Trans-Bay Tube in the vicinity of the Embarcadero and will extend west of Twin Peaks. A connection will be

made via a Mission line to Daly City. A Trans-Bay Tube will be constructed by the Department of Public Works of the State of California underneath San Francisco Bay connecting San Francisco and Oakland. The Oakland downtown segment of the rapid transit system will provide direct connection north via a Berkeley-Richmond line to the vicinity of Richmond, east via a Central Contra Costa line to the vicinity of Concord, and south via a southerly Alameda County line to the vicinity of Fremont. This mass rapid transit system includes underground and overground construction, subways, tunnels, passenger stations, off-street parking facilities, lands, rights of way, rail lines, track construction, stations, platforms, switches, yards, terminals, power and control systems, and all other works, property or structures necessary or convenient to provide an integrated three-county rapid transit system for the purpose of carrying out the provisions of the San Francisco Bay Area Rapid Transit District Act. . . ."

BART's bond election resolution also set forth the exact language of the ballot measure to be as follows:

"Shall San Francisco Bay Area Rapid Transit District incur a bonded indebtedness in the principal amount of $792,000,000 for the object and purpose of acquiring, constructing and operating a rapid transit system for the transportation of passengers and their incidental baggage, including rights of way, rail lines, bus lines, stations, platforms, switches, yards, terminals, parking lots and any and all other facilities necessary or convenient for rapid transit service within or partly without the district, underground, upon or above the ground and under, upon, or over public streets, highways, bridges, tubes, tunnels, or other public ways or waterways, together with all physical structures necessary or convenient for the access of persons and vehicles thereto, including lands, easements, rights to the use or joint use of any or all of the foregoing and all other works, property or structures necessary or convenient to carry out the objects, purposes and powers vested in the District under the 'San Francisco Bay Area Rapid Transit District Act'?"

Where voting machines were to be used the ballot measure was required to be:

"San Francisco Bay Area Rapid Transit District Bonds: Authorizing San Francisco Bay Area Rapid Transit District to incur a bonded indebtedness of $792,000,000 for a rapid transit system pursuant to the San Francisco Bay Area Transit District Act."

More than the required number of voters (60 percent) voted for the bond issue in San Francisco, Alameda, and Contra Costa Counties in the November 6, 1962 general election.

On April 12, 1971, an agreement was entered into between BART and the City and County of San Francisco. It provided for modification of the system's planned facilities in the West Portal District of San Francisco, as follows. The plans for a subway, approximately one mile in length, extending from Twin Peaks Tunnel under West Portal Avenue to the general area of St. Francis Circle where the tracks would surface, were abandoned. Substituted therefor was surface trackage on West Portal Avenue. BART would design and construct a West Portal Transit Station. BART further agreed to complete construction of an Embarcadero Transit Station (exclusive of design).

*The Common Issue*

██ Each of the proceedings before us concerns the validity of the agreement of April 12, 1971. Plaintiffs on the appeal, and respondent to the application for mandate, contend that the agreement, insofar as it purports to abandon the plans for construction of the West Portal subway and as consideration therefor proposes construction or completion by BART of an Embarcadero Transit Station is invalid and ultra vires. We first address ourselves to this issue.

██ It is undoubtedly true, as contended, that the BART resolution stating the purposes of and calling the bond election, and the acceptance of the ballot proposition by the voters, was analogous to a contract between BART and the voters or at least the taxpayers of the district. (*Flood Control Dist.* v. *Wright,* 213 Cal. 335, 348-349 [2 P.2d 168]; *O'Farrell* v. *County of Sonoma,* 189 Cal. 343, 348 [208 P. 117]; *Peery* v. *City of Los Angeles,* 187 Cal. 753, 767 [203 P. 992, 19 A.L.R. 1044]; *Skinner* v. *City of Santa Rosa,* 107 Cal. 464, 476 [40 P. 742].) The laws which authorized the bond issue were a part of that contract. (*Sutter Basin Corp.* v. *Brown,* 40 Cal.2d 235, 241 [253 P.2d 649]; *State School Bldg. Fin. Com.* v. *Betts,* 216 Cal.App.2d 685, 691 [31 Cal.Rptr. 258]; *Jenkins* v. *Williams,* 14 Cal.App. 89, 98 [111 P. 116].) And obviously, the terms of the specific proposal submitted to voters have the attributes of such a contract and must be respected. (See *Skinner* v. *City of Santa Rosa, supra,* 107 Cal. 464.)

██ But we note that nowhere in the Act, or in BART's resolution calling the bond election and stating the object and purpose of incurring the bonded indebtedness, or in the specific proposals placed before the district's voters on voting machines and paper ballots, is there any statement or indication that the intended plans embraced a West Portal subway, or indeed any specific subway location anywhere in the system. Instead general language was used; details of whether any, and which,

parts of the proposed system would be elevated, or on the surface, or underground, were nowhere stated.

However, it is pointed out to us that the Composite Report does state that "West of Twin Peaks a rapid transit subway for initial use by street-cars is planned." It is urged that this provision, or in any event the approval of the Composite Report by the respective county boards of supervisors (as required by § 29154), brought into being the contract between BART and the district's taxpayers.

It seems proper to here emphasize that the Composite Report was prepared by engineers, and others, who were charged by statute (§§ 29151, 29152), not with making final, or even tentative, plans for a rapid transit system, but instead to study and report, in order that BART's board of directors might "determine the feasibility" of the project. "Feasible" is defined as "Capable of being done, executed, or effected; possible of realization; . . . ." (Webster's New Internat. Dict. (2d ed.)) There was obviously no legislative intent, and it would otherwise be unreasonable to conclude, that the feasibility report became binding in the details of its study on BART, and later as a contract between BART and the taxpayers of the district.

The acceptance and approval of the Composite Report by BART amounted in law to no more than acceptance of its recommendation that the proposed rapid transit project was feasible. In thereafter planning and constructing the project, and in spending the bond proceeds, BART was in no way restricted by statements of the Composite Report. (See *East Bay Mun. Util. Dist.* v. *Sindelar,* 16 Cal.App.3d 910, 918 [94 Cal.Rptr. 431].)

A similar conclusion was reached in *Mills* v. *S. F. Bay Area Rapid Transit Dist.,* 261 Cal.App.2d 666, 669 [68 Cal.Rptr. 317]. That case also concerned the Act, the Composite Report and its approval by BART and the boards of supervisors, the resolution calling a bond election, and the ballot propositions with all of which we are concerned. BART decided to locate a "Lafayette Station" one and one-half miles from where the Composite Report said it would be located. A similar "contractual" contention was made. The court said (pp. 668-669): "Here, the proposition printed on the ballot described only in the most general terms its object and purpose of 'acquiring, constructing and operating a rapid transit system,' including a number of items, among them 'terminals.' [¶] The resolution calling the bond election, although not printed on the ballot, was published. It contained a 'statement of the general object and purpose of incurring such indebtedness.' This statement's only reference to the

station here in issue was that the system would provide connection 'east via a Central Contra Costa line to the vicinity of Concord,' a community near Lafayette. [¶] It is completely apparent that neither the ballot proposition nor the notice of election specified the location of any station, nor even required a station in or adjoining Lafayette. [¶] Appellants, however, rely upon the composite report which did suggest a specific location. But this report is referred to in the resolution calling the election only by way of recital, stating that experts have been employed 'to develop general plans, estimates and general specifications . . . sufficient . . . to enable this Board to determine the feasibility of such project.' The statute requires only that the experts develop 'general plans, estimates and general specifications . . . sufficient . . . to enable the board to determine the feasibility' of the project as a whole (Pub. Util. Code, § 29151). Their reports are to contain '[a] general description of the facilities to be acquired or constructed from the proceeds of. the proposed bond issue' (*id.*, § 29152, subd. (a)). The resolution calling the bond election is to contain a 'statement of the general object and purpose of incurring the indebtedness' (*id.*, § 29159, subd. (a)). [¶] Obviously, the statutes, the notice of election and the ballot proposition itself contemplate a broad authority for construction of a three-county rapid transit system. In the wide scope of this substantial transit project, the deviation of 1½ miles in location of a single station is but a minor change in the tentative plan which was relied upon only to forecast feasibility of the project as a whole."

The approval of the Composite Report by the county boards of supervisors similarly had the legal effect of a determination by those bodies that the rapid transit project was feasible. It would be unreasonable to hold that the supervisorial approval bound BART to the preliminary and tentative details of the Composite Report. It would also be contrary to law; section 29158 provides that upon such approval BART shall submit to the voters "the proposition of incurring such bonded indebtedness for the acquisition, construction or completion of rapid transit facilities by the district and all other works, property, or structures necessary or convenient therefor and for the purpose of carrying out the provisions of this part." By this language BART is given broad powers in designing and constructing the system; this is irreconcilable with any theory that the feasibility report of sections 29151 and 29152 controls those matters.

It appears to be true, unfortunately, that prior to the BART bond election there was much unofficial discussion and publicity concerning the "proposed" West Portal subway. But as said in *Mills* v. *S. F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d 666, 669, such information, although disseminated to the general public, "cannot be deemed to modify

the intentionally broad language of the proposition in fact submitted to the voters, the call of the election published to them, and the statutes authorizing the procedures adopted . . . ."

Some emphasis is placed on an "Official Report" of BART made November 23, 1963 (more than a year *after* the bond election) which spoke of a planned west of Twin Peaks "subway route." But this report appears to have truthfully stated BART's plans as they existed in 1963; it could in no way have influenced the earlier election.

We now turn to the related contention that BART is powerless to construct the Embarcadero Transit Station, apparently since that specific structure was nowhere mentioned in the preelection proceedings, or perhaps because it would be built with funds which otherwise would have been allocated to the West Portal subway. The Act authorized the construction of a "rapid transit system" of which passenger stations were necessarily a part. BART's bond election resolution provided for the acquisition, construction and completion of a rapid transit system including, among many other things, "passenger stations." The paper ballot proposals spoke, among other things, of the construction of a rapid transit system including "stations," while the abbreviated voting machine proposal referred to "a rapid transit system pursuant to the [Act]." The instant contention is wholly without merit.

### The Appeal (1 Civil 30416)

In a taxpayers' class action, plaintiffs filed their complaint against BART and certain of its officers "for injunction, temporary restraining order, and preliminary injunction." They sought thereby: (1) an order enjoining the alteration of the Composite Report's plans, as proposed in the agreement of April 12, 1971, until authority therefor was given by the district's voters, and (2) a mandatory order directing BART to "commence immediately or continue with deliberate speed the Twin Peaks line and West Portal subway" as planned in the Composite Report.

After a hearing the superior court made and entered an order denying plaintiffs' motion for a preliminary injunction. The appeal before us is taken from that order. For the reasons we have stated the order denying the preliminary injunction must be affirmed.

### The Writ of Mandate

In 1969 BART was apparently in need of additional funding to complete the rapid transit project. The Legislature enacted sections 29140-29144 q.v., authorizing the imposition of "retail transactions and use

taxes" for the needed additional funds. These tax proceeds are now being received and used by BART.

W. F. Goelz, BART's treasurer, had been ordered to transfer $22,-500,000 of the district's funds (including such tax proceeds) in a manner to facilitate and assure construction of the Embarcadero Transit Station. He refused to do so for the following reasons: (1) He "could not safely do so pending outcome of the *Tooker* action" (the decision which is here under review), and (2) He "does not have a duty to spend Retail Transactions and Use Tax funds on the Embarcadero Station because to do so would be an illegal act."

BART thereupon filed in this court a petition for writ of mandate requiring its treasurer to comply with the instructions concerning transfer of $22,500,000 of its funds. We issued an alternative writ of mandate requiring the treasurer to comply with those instructions or show cause why he has not done so. The cause he has shown is similar to the reasons previously given to BART for his refusal.

We now consider whether the application by BART, and its treasurer, of retail transactions and use tax proceeds "for the construction and completion of the Embarcadero Transit Station" would be an "illegal act."

The pertinent statutory provision is section 29142, which provides: "Revenues derived from such taxes, not to exceed an aggregate principal amount of one hundred fifty million dollars ($150,000,000), plus the costs payable by the district to the State Board of Equalization for preparatory costs and for its services in connection with such taxes and plus the costs of issuance of, and interest payments on, bonds or notes secured by such revenues, shall be used for the planning, acquiring and constructing of the district's approximately 75-mile system, including the San Francisco-Oakland Rapid Transit Tube and any and all works, structures, property, rolling stock or other facilities of any kind which the district is authorized to acquire, construct or complete."

The Embarcadero Transit Station is, as we have pointed out, a portion of the rapid transit system authorized to be constructed by BART. Section 29142, in broad language, authorizes application of the subject retail transactions and use tax proceeds for such a purpose. For this reason, and because we have found no merit in the *"Tooker"* action and the appeal taken therein, the peremptory writ of mandate must be ordered.

We hold that it was, and is, within the power of BART to eliminate any plans for a West Portal subway and to substitute therefor surface trackage, to construct and complete the West Portal Transit Station and the Embarcadero Transit Station, and otherwise to proceed in accordance

with the agreement of April 12, 1971. We also hold that sections 29140-29144 authorize use of the proceeds of retail transactions and use taxes for such purposes.

In 1 Civil 30416 the order denying a preliminary injunction is affirmed. In 1 Civil 30605 the peremptory writ of mandate will issue.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied January 27, 1972, and appellants' petition for a hearing by the Supreme Court was denied March 1, 1972.