[Civ. No. 40303. First Dist., Div. One. May 3, 1979.]

ASSOCIATED STUDENTS OF NORTH PERALTA COMMUNITY
COLLEGE et al., Plaintiffs and Appellants, v.
BOARD OF TRUSTEES OF THE PERALTA COMMUNITY
COLLEGE DISTRICT et al., Defendants and Respondents.

## COUNSEL

Coppelman & Hiestand, Fred J. Hiestand, Clifford Sweet, Frank Roesch and Eliot Lee Grossman for Plaintiffs and Appellants.

Richard J. Moore, County Counsel, and William E. Rundstrom, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**NEWSOM, J.**—This is an appeal from a judgment denying a petition for a writ of mandate which sought to compel the Peralta Community College District Board of Trustees (Trustees) to keep open the Grove Street college campus, and to adopt a plan for repayment of at least $10 million in bond initiative revenues for construction of a degree-granting college on the Grove Street college site.

In salient part the background of the case is as follows.

The Peralta Community College District (District) was formed in 1963, embracing the area of Alameda, Albany-Berkeley, Emeryville, Oakland and Piedmont. A year later the Trustees created a 72-member Citizens Advisory Committee, which in 1965 made recommendations including the scheduling of a bond election to issue $47 million in bonds. Our perusal of the recommendations convinces us, as appellants argue, that all interested parties fully expected that four campuses would be built, one of them in the Berkeley-Albany area.

While the minutes of the July 12, 1965, meeting of the Trustees at which a resolution calling for the bond election was adopted do not reflect official adoption of the advisory committee's recommendations, the record below shows that such was the intention of the Trustees. In any event, Resolution No. 65/66-01 was passed. It reads as follows, in conformity with the provisions of Education Code section 15100, which

defines the authority of a school district to order bond elections: "WHEREAS, in the judgment of this Board of Trustees of the Peralta Junior College District of Alameda County, State of California, it is advisable to call an election to submit to the electors of the said district the question whether or not bonds of the district shall be issued and sold in the amount of Forty-Seven Million and no/100 ---------- Dollars ($47,000,000.00) for the following purposes: [¶] —The purchasing of school lots; [¶] —The building or purchasing of school buildings; [¶] —The making of alterations or additions to the school building or buildings other than such as may be necessary for current maintenance, operation, or repairs; [¶] —The repairing, restoring, or rebuilding of any school building damaged, injured, or destroyed by fire or other public calamity; [¶] —The supplying of school buildings and grounds with furniture; equipment or necessary apparatus of a permanent nature; [¶] —The permanent improvement of the school grounds; and [¶] —The carrying out of the projects or purposes authorized in Section 15811 of the *Education Code,* to wit, to provide sewers and drains adequate to treat and/or dispose of sewage and drainage on or away from school property. [¶] Now, THEREFORE, BE IT RESOLVED that the District Attorney of the County of Alameda be and he is hereby requested to prepare a resolution calling a bond election for the issuing of bonds in the above amount for the above purposes."

A preelection campaign ensued, attended by considerable publicity which indicated in part an intention to build four campuses, and resulted in approval of the ballot proposition, which read as follows:

| | |
|---|---|
| Shall the Peralta Junior College District of Alameda County incur a bonded indebtedness in the sum of Forty-seven Million Dollars ($47,000,000) for the purpose of raising money for the following purposes (which are hereby united and shall be voted upon as one single proposition) to wit:<br><br>The purchasing of school lots;<br><br>The building or purchasing of school buildings; | BONDS—YES |
| The making of alterations or additions to the school building or buildings other than such as may be necessary for current maintenance, operation, or repairs; | |
| The repairing, restoring, or rebuilding of any school building damaged, injured, or destroyed by fire or other public calamity;<br><br>The supplying of school buildings and grounds with furniture, equipment or necessary apparatus of a permanent nature;<br><br>The permanent improvement of the school grounds; and<br><br>The carrying out of the projects or purposes authorized in Section 15811 of the Education Code, to wit, to provide sewers and drains adequate to treat and/or dispose of sewage and drainage on or away from school property? | BONDS—NO |

Following the election, the Trustees adopted a tentative budget which allotted $7.3 million for development of a Berkeley-Albany campus, and, as the evidence shows, every indication through at least 1971 reveals an intention to build a full-scale Berkeley-Albany campus.

But because of numerous economic obstacles, including rising land and construction costs, and steadily declining enrollment, the campus was never built.

Eventually, in 1974, pursuant to the recommendations of Chancellor Fryer, and notwithstanding their recognition of the District's long-standing commitment to build a Berkeley-Albany campus, the Trustees abandoned this fourth campus. It was this decision that led appellants to file the instant action.

Appellants' appeal is based upon a contract theory. In their view the Trustees breached a contractual obligation created between the District and its electors as a result of the 1965 election. Appellants' second argument is that, even if no express contract is found, the electors have justifiably relied upon the District's reaffirmation by conduct of its obligation to build the fourth campus. And a third argument is that, even absent an agreement, express or implied, public policy demands that the demonstrated will of the electorate be implemented.

I

The relationship arising out of a bond election has been defined in a number of California cases. California Constitution, article XVI, section 18, which prohibits a public entity from incurring debt exceeding revenue in any year, absent a two-thirds vote of qualified electors, led to a number of early decisions which found in bond elections and comparable situations a contractual relationship between the public entity and individual electors. (Cf. *Merchants Bank* v. *Escondido Irr. Dist.* (1904) 144 Cal. 329 [77 P. 937]; *Skinner* v. *City of Santa Rosa* (1895) 107 Cal. 464 [40 P. 742].) However, a later decision, now regarded as the leading case on the subject, retreated from this classification of the relationship as contractual. (*Peery* v. *City of Los Angeles* (1922) 187 Cal. 753 [203 P. 992, 19 A.L.R. 1044].) That case involved multiple actions to enjoin a city from disposing of certain bonds at less than par value, or on terms yielding greater interest than specified in the election ordinance. The court, after referring to both *Skinner* and *Merchants Bank,* concluded that it was unnecessary to consider the relationship between public entity

and electorate as strictly contractual, the status being merely *analogous* to a contract.

Since *Peery,* the cases have adopted one or another of these theories, some finding a contractual, others an analogous to contract, status. (Cf. *Tooker* v. *San Francisco Bay Area Rapid Transit Dist.* (1972) 22 Cal.App.3d 643, 649 [99 Cal.Rptr. 361]; *Eastern Mun. Water Dist.* v. *Scott* (1969) 1 Cal.App.3d 129, 135 [81 Cal.Rptr. 510].)

■ Whatever their view of the precise legal relationship of entity and electorate, the courts have been consistent in defining the elements which comprise it. All have agreed, for example, that the statute authorizing the creation of the bonded indebtedness is presumptively within the knowledge of each elector (*Peery* v. *City of Los Angeles, supra,* 187 Cal. at p. 761; *City of Los Angeles* v. *Dannenbrink* (1965) 234 Cal.App.2d 642, 655 [44 Cal.Rptr. 624]), and the statute which creates the bonding entity presumed known to each voter (*Flood Control Dist.* v. *Wright* (1931) 213 Cal. 335, 349 [2 P.2d 168]).

The resolution by which the bonding entity resolves to submit the issue to the District's electors has also been regarded as part of the "contract" between the entity and its electors. (*O'Farrell* v. *County of Sonoma* (1922) 189 Cal. 343, 348 [208 P. 117]; *Tooker* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 22 Cal.App.3d 643, 649.) Indeed, in *O'Farrell* where a board of supervisors adopted a resolution which quite specifically provided for construction of a four-mile road, the details of the resolution were stated so precisely as to be considered obligatory, the board being precluded from thereafter altering the road design. (*Id.,* at p. 348.) In *Wright,* on the other hand, the resolution was by its terms broad enough to warrant the board's changing its plan as the occasion required, without impairment of the underlying "contract" (*Flood Control Dist.* v. *Wright, supra,* 213 Cal. at pp. 340, 349-350; cf. also *Mills* v. *S.F. Bay Area Rapid Transit Dist.* (1968) 261 Cal.App.2d 666, 669 [68 Cal.Rptr. 317]; and *Robbins* v. *Sonoma County Flood etc. Dist.* (1956) 138 Cal.App.2d 291, 294 [292 P.2d 52]), where statutes, notice of election and ballot propositions all contemplated broad authority which in no way compelled siting of a Bart station at a specific location.

A third element of the "contract" is the ballot proposition submitted to the voters. (*Golden Gate Bridge etc. Dist.* v. *Filmer* (1933) 217 Cal. 754 [21 P.2d 112, 91 A.L.R. 1]; *East Bay Mun. Util. Dist.* v. *Sindelar* (1971) 16 Cal.App.3d 910, 918 [94 Cal.Rptr. 431]), which here again was stated in

general terms and does not purport to limit the District to either numbers or locations of campuses.

The fourth and final element is assent or ratification by the electors, which, of course, is present here. (Cf. *O'Farrell* v. *County of Sonoma, supra,* 189 Cal. 343, 348; *Skinner* v. *City of Santa Rosa, supra,* 107 Cal. 464.)

Extrinsic documents may be added to the primary elements comprising the relationship. (*Flood Control Dist.* v. *Wright, supra,* 213 Cal. at p. 340; *Robbins* v. *Sonoma County Flood etc. Dist., supra,* 138 Cal.App.2d 291, 294.) Both of those cases, however, dealt with documents which directed the attention of voters to specific details of the bonded project in either the resolution calling the election, or the ballot proposition itself, whereas, in the instant case, references to particulars are contained in a voter's pamphlet stating pro and con arguments.

How restrictive such extrinsic documents may be is not clear from California decisions on a case-by-case basis. Thus, several cases have concluded that, even where quite specific engineering and economic feasibility reports have been incorporated, the District is not restricted by statements made in such reports. (*East Bay Mun. Util. Dist.* v. *Sindelar, supra,* 16 Cal.App.3d 910, 918.) And this has been true even where the report was required before the bond proposal could be submitted to the electorate, at least where the report is merely mentioned by reference or recital in the ordinance calling for the election. (*Tooker* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 22 Cal.App.3d 643, 651; *Mills* v. *S.F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d at p. 669.)

II

Applying these elements to the present case, appellants view is that the "bond contract" by its terms constituted an enforceable promise to build four campuses with the bond revenues. They point to the "Argument for Peralta College Bonds," which included the statement that "this bond proposal is the result of a thorough five-month study by a 72-member citizens advisory committee. It has been endorsed by labor, business groups, and civic organizations." This, appellants' argue, is a reference which incorporates into the "bond contract" the recommendations of the Citizens Advisory Committee.

Initially we observe that no case or statutory authority supports the proposed incorporation into the "bond contract" of the ballot argument

submitted to the voters prior to the election. At least one California decision implies that this may not be done. (Cf. *Mills* v. *S.F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d 666, 669.) And, as said in *City of Los Angeles* v. *Dannenbrink, supra,* 234 Cal.App.2d at page 655: "A system of law which authorizes the electorate to pass upon proposed charter amendments will not permit a court to assume that the voters did not know what they were doing when they voted upon a specific proposal. Moreover, if the enlightenment of the electorate should be a subject of judicial inquiry, the court could not infer that the knowledge of the voters was limited to what appeared in the campaign propaganda of the protagonists. The full text of each proposed charter amendment, including the matter to be stricken, was mailed to every voter well in advance of election day. *No public official or private citizen is authorized to change the substance or effect of such a proposal by the characterization he employs in advocating its adoption or defeat.*" (Italics added.)

And neither the *Wright* nor the *Robbins* decisions supports appellants' contention. In both those cases very specific delineation of purpose and exact reference to documents were involved, whereas, in the instant case, the ballot argument makes no reference to any report or recommendation, but merely alludes to the fact of the proposal resulting from long study by a broadly based committee.

Even if we were to assume that the ballot argument formed part of the "bond contract," the recommendations in question reveal that only one specific site had been selected; that the $47 million figure was based upon the number of students to be accommodated rather than a particular number of campuses to be built; and that in any event the "Berkeley waterfront" site was not regarded as a certainty because of cost, acquisition and time problems.

### III

As earlier stated, there is no California decisional authority requiring literal application of contract interpretation principles to cases like that before us.

Appellants find the "intent" of the parties "crystal clear" especially "from the testimony" at trial. We find, to the contrary that such testimony makes clear only what the witnesses *who testified* intended, but that evidence cannot be equated with the intent of the voters in the District at

a particular moment in time. And similarly the "intent" of some Peralta District officials cannot be binding upon the District when such intent does not appear either in the resolution, the ballot proposition, or the governing statutes. Indeed, such officials are prevented by relevant statutory provisions from assenting to certain bonded indebtednesses, or from entering into contracts which violate article XVI, section 18, of the California Constitution.

We further find appellants' argument of a contract created by appellants' justifiable reliance on respondents' postelection conduct to be meritless, if only because manifestly no detriment resulted from the alleged reliance. Once the voters approved the bond issue, subsequent conduct could not affect their prior decision. A reliance interest, if any, would have to be predicated on respondents' conduct before the election.

## IV

Appellants' "public policy" argument that the voters' expectations must be fulfilled, seems to us a thinly disguised contention that the voters were defrauded by the District's alleged misrepresentations. Thus, the statement: "[I]n the instant case, there was a deliberate, calculated and clear pattern by the Peralta Trustees and high administration officials to induce the electorate to approve the bond proposal by promising to construct four campuses with the bond revenues."

Ignoring for the moment the fact that the fraud count was dismissed by the court below, the evidence at trial was conclusive to the effect that the trustees did not intentionally seek to mislead the electorate. We will observe, too, that if whenever a group of voters considered that their electoral will had been frustrated, they could argue for implementation of *their* understanding of the sense of official assurances, preelection statements, publicity and unofficial discussions, an intolerable number of disputes would result. (*Tooker* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 22 Cal.App.3d 643, 651; *Mills* v. *S.F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d 666, 669; *City of Los Angeles* v. *Dannenbrink, supra,* 234 Cal.App.2d 642, 655.)

## V

While it is unnecessary for us to pass upon the appropriateness of the remedy sought by appellants we deem it useful to comment briefly that mandamus is not proper where no practical benefit could result to

petitioner. (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 671 [56 Cal.Rptr. 265, 423 P.2d 193]; *Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6].)

Here, in the light of Chancellor Fryer's uncontradicted testimony that no state funds would be available for a fourth campus, that the District is overbuilt, and that a fourth campus would be economically and educationally ill-advised, mandamus would appear to require an unwarranted intrusion into the District's discretion.

We, accordingly, find that substantial evidence supported the trial court's denial of the petition.

Affirmed.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied May 30, 1979, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied July 19, 1979.